13-1120SAG to 13-1145SAG

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINES AND SEARCH AND SEIZURE WARRANTS

### I.    AFFIANT AND EXPERTISE

Task Force Officer Brian Shutt, after being duly sworn, states as follows:

1.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

2.    I have been a sworn police officer with the Baltimore City Police Department since June 20, 2002 and am currently assigned to the Violent Crime Impact Division, HIDTA Task Force. Prior to my employment with the Baltimore City Police Department, I was a sworn Deputy Sheriff with the Cecil County Sheriff's Office from June 1999. While employed as a law enforcement officer, I have held positions within the Patrol Division, and the Criminal Investigative Division. I have completed two separated six-month basic Police Academies that included classes pertaining to Controlled Dangerous Substances (CDS). I have also attended more than ten advanced investigative courses. Prior assignments with the Baltimore City Police include uniform patrol division in the Eastern District, and also the Eastern District Drug Unit. I have personally conducted and participated in numerous investigations involving criminal activity including but not limited to controlled substances, violent crime, and firearms violations. I have participated in the arrest of over 800 persons for narcotics, violent crime, and/or firearms violations and have authored and/or executed more than 300 Search and Seizure Warrants relating to narcotics, violent crime, and/or firearms violations. During my time in law enforcement, I have learned the following:

a. Persons involved in the illegal distribution of CDS keep and maintain records of their various activities. Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. I know that drug traffickers often have several residences decreasing the likelihood of detection by law enforcement.

b. Persons involved in the illicit distribution of CDS, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above.

c. I also know, based on training and experience, that large scale drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities.

d. Persons involved in the illicit distribution of CDS utilize cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals.

e. Persons involved in the illicit distribution of CDS take or cause to be taken photographs of themselves, their associates, their property and their product. These traffickers usually maintain these photographs in their possession, in locations such as their homes, vehicles, electronic devices, or on their person.

f. I know, based on training and experience, that drug traffickers commonly have in their possession, that is, on their person, in their residences and/or

businesses, firearms and other weapons. Said firearms and weapons are used by the traffickers to protect and secure their large amounts of narcotics and United States currency from loss to law enforcement agents or other members of the criminal element that are motivated by greed.

g. I know, based on training and experience, that drug traffickers commonly have in their possession, that is, on their person, in their residences and/or businesses, packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

3. This affidavit is submitted in support of criminal complaints against certain persons (hereinafter collectively "the TARGET SUBJECTS); and applications for search warrants for certain locations (herein collectively, the "SUBJECT LOCATIONS"); and vehicles (collectively the "SUBJECT VEHICLES), based upon the DEA's investigation of Shawn MALONE's drug trafficking organization (DTO or MALONE DTO). Because this affidavit is being submitted for the limited purpose of establishing probable cause for warrants to arrest the TARGET SUBJECTS and/or search the SUBJECT LOCATIONS and VEHICLES, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on my review of the audio recordings. Because this investigation relied upon the interception of wire and electronic communication over several cellular telephones, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in brackets my "translation" of the words or

terminology used. These interpretations, as well as my opinions contained herein, are based upon my training, experience and my knowledge of this particular DTO's operation.

## II.    PERSONS TO BE ARRESTED AND/OR SEARCHED

4.    The following is a list of the TARGET SUBJECTS, who, based upon the information contained herein, there is probable cause to arrest for violations of Title 21 of the United States Code §846, to wit: conspiracy to distribute and possession with the intent to distribute controlled substance, as well as Title 18 of the United States Code § 1956(h), to wit money laundering:

A.  **Shawn Joseph MALONE**, a/k/a "Studder," a/k/a "Snaps," a black male with a date of birth (DOB) in 1982 (**MALONE**). MALONE has been identified as the user of telephone numbers (410)***-1671, (**C-Line**); (443)***-2364, (**G-Line**); (224)***-0098; (410)***-0984; (410)***-1607; (240)***-5759; and (410)***-8650; (410)***-6974, (**J-Line**); (410)***-6232. MALONE has a prior criminal conviction for possession with the intent to distribute controlled substances, and a conviction in the State of Texas for Money Launder over 3,000 under 20,000. Probable cause specific to this individual may be found *passim*;

B.  **Antoine BOLDEN**, a/k/a "Demo," a black male with a DOB in 1977 (**BOLDEN**). BOLDEN has been identified as the user of telephone numbers (443)***-0762; and (443)***-3008, (**A-Line**)[1]. BOLDEN has prior criminal convictions for second degree murder, and illegal possession of a handgun. Probable cause specific to this individual may be found *passim*;

C.  **Stanley MALONE**, a/k/a "Man-Man," a black male with a DOB in 1981 (**S.MALONE**). S. MALONE has been identified as the user of telephone numbers (410)***-9191; (443)***-3390; (240)***-6500 and (410)***-6817, (**H-Line**)[2]. S.MALONE has two prior criminal convictions for possession with the intent to distribute controlled substances, and a conviction for robbery with a deadly weapon. Probable cause specific to this individual may be found in ¶¶ 9, 13, 31-32, 51, 79, 86, 88, 95, 113-15, 117;

D.  **Melvina BANKS**, a/k/a "Bebe," a black female with a DOB in 1960 (**BANKS**). BANKS has been identified as the user of telephone number (443)***-7744, (**E-Line**)[3]. BANKS has prior criminal convictions for trespassing, and failure to return a rental vehicle. Probable cause specific to this individual may be found in ¶¶ 20-28, 33-37, 93, 123;

---

[1]    Unless otherwise noted, all communications involving BOLDEN were sent or received over the A-Line.
[2]    Unless otherwise noted, all communications involving S.MALONE were sent or received over the H-Line.
[3]    Unless otherwise noted, all communications involving BANKS were sent or received over the E-Line.

**E.  Travis GAINES**, a/k/a "Jim," a black male with a DOB in 1980 (**GAINES**).  GAINES has been identified as the user of telephone number (443)***-6739.  GAINES has prior criminal convictions for possession with the intent to distribute controlled substances.  Probable cause specific to this individual may be found in ¶¶ 38-44, 71-73, 114;

**F.  Louis REYES**, a/k/a "Rico," a black male with a DOB in 1974 (**REYES**).  REYES has been identified as the user of telephone number (443)***-9680.  REYES has two prior criminal convictions for possession with the intent to distribute controlled substances.  Probable cause specific to this individual may be found in ¶¶ 114-16, 118;

**G.  Donte CHASE**, a/k/a "Turbo," a black male with a DOB in 1979 (**CHASE**).  CHASE has been identified as the user of telephone number (443)***-8301.  CHASE has prior convictions for attempted second degree murder, and use of a firearm and possession of controlled substances.  Probable cause specific to this individual may be found in ¶¶ 52-55, 107-109;

**H.  Howard MCCRAY**, a/k/a "Pooh," a black male with a DOB in 1979 (**MCCRAY**).  MCCRAY has been identified as the user of telephone number (410)***-7424, (**B-Line**); and (410)***-4587, (**D-Line**).  MCCRAY has prior convictions for possession with the intent to distribute controlled substances; unlawful manufacture of a controlled substance; and possession of a controlled substance.  Probable cause specific to this individual may be found in ¶¶ 62-66, 119-21;

**I.  Latoya MACK**, a black female with a DOB in 1988 (**MACK**).  MACK was stopped in January 2013 in Frederick, Maryland after traveling from Phoenix, Arizona.  MACK fled the scene, and a search warrant was executed on her abandoned property where investigators seized 1.5 kilograms of cocaine.  MACK has a prior conviction for theft less than $300.  Probable cause specific to this individual may be found in ¶ 84;

**J.  Ashley RICHARDSON**, a black female with a DOB in 1987 (**RICHARDSON**).  RICHARDSON has been identified as the user of telephone number (443)***-1690.  RICHARDSON has no prior convictions.  Probable cause specific to this individual may be found in ¶¶ 96-101; and

**K.  Karl MCDONALD**, a/k/a "Lil Boo," a black male with a DOB in 1983 (**MCDONALD**).  MCDONALD has been identified as the user of telephone number (518)***-5420 (**I-Line**)[4].  MCDONALD has two prior convictions for possession with the intent to distribute controlled substances.  Probable cause specific to this individual may be found in ¶¶ 8-11, 77-82, 87-89, 113-14.

## III.  VEHICLE TO BE SEARCHED

---

[4]    Unless otherwise noted all communications involving MCDONALD were sent or received over the I-Line.

5.      The following is the SUBJECT VEHICLE, which, based upon the information contained herein, there is probable cause to search for violations of Title 21 of the United States Code §846, to wit: conspiracy to distribute and possession with the intent to distribute controlled substance, as well as Title 18 of the United States Code § 1956(h), to wit conspiracy to launder money: a black Lexus, bearing Maryland registration 8AX4989, Vehicle Identification Number (VIN) JT8BF28GXW5032971, listed to Antoine BOLDEN, 4502 Ritchie Highway, Baltimore 21225, (**BOLDEN's Lexus**).  Probable cause specific to this vehicle may be found in ¶¶ 19, 25-26;

## IV.   LOCATIONS TO BE SEARCHED

6.      The following is a series of sections discussing the individual locations to be searched (collectively the SUBJECT LOCATIONS), which, based upon the information contained herein, there is probable cause to search for violations of Title 21 of the United States Code §846, to wit: conspiracy to distribute and possession with the intent to distribute controlled substance, as well as Title 18 of the United States Code § 1956(h), to wit conspiracy to launder money (the SUBJECT OFFENSES):

A. **1911 Braddish Avenue**, 1st Floor Apartment, Baltimore, Maryland 21216 (**1911 Braddish Avenue**).  Probable cause specific to this location may be found in ¶¶ 7-15, 55, 86-89, 119.

7.      1911 Braddish Avenue, 1st Floor Apartment, Baltimore, Maryland 2126 has been identified as the residence of BOLDEN.

8.      On February 19, 2013 at approximately 3:00 p.m., BOLDEN called telephone number (443)***-9716, utilized by a male only known as "Scar." During this call, BOLDEN told Scar, "I got the shit in my pocket so…" Scar responded that he (Scar) was waiting on the bus at the top of North Avenue, and BOLDEN told him (Scar) to wait there and he (BOLDEN)

would pick him up on his way to the Westside. BOLDEN then stated, "Cause I gotta uh, I gotta uh meet Boo (MCDONALD) over there anyway. And I'm dirty, so I'm trying to shoot straight to Braddish." Later in the conversation, BOLDEN stated, "I'm coming straight to Braddish cause I'm dirty [I'm carrying drugs]." I believed that during this conversation BOLDEN was telling Scar that he was transporting drugs ("I'm dirty') from an eastside "stash" location to the Westside stash location, **1911 Braddish Avenue**, and that he (BOLDEN) would pick him (Scar) up. BOLDEN explained to Scar that he was "dirty," which I know to be a coded term to refer to being in possession of drugs.

9.      On February 23, 2013 at approximately 4:37 p.m., BOLDEN received a call from MALONE, who was utilizing C-Line. During the call, BOLDEN stated, "Anyway he (S.MALONE) up C.H., waiting on me." MALONE replied, "You said what, you said what?" BOLDEN replied, "He up C.H. waiting on me." MALONE replied, "Alright, alright, um, um, you said P.H." BOLDEN replied, "I said he up C.H. You hear me?" MALONE replied, "Yeah. I don't know what you talking about." BOLDEN asked, "Who the fuck is this?" MALONE answered, "Shawn [MALONE] yo." BOLDEN responded, "Alright bitch. I said he up C.H. the fuck you don't mean you don't know what I'm talking about?" MALONE asked, "You said B?" BOLDEN answered, "C, C bitch. C, C.H. bitch." MALONE's reply was inaudible. BOLDEN then stated, "C like Cherry bitch, C.H." MALONE replied, "I can't. Yo, yo, your phone is doing so much in and out, I'm trying…" BOLDEN stated, "A, B, C bitch. C. A, B, C bitch. C, C.H. bitch." MALONE, "I don't know where you at yo." BOLDEN replied, "Stephanie bitch." MALONE replied, "Oh you said P. Yeah I can't …" BOLDEN replied, "I said C. I said C.H. bitch." MALONE stated, "Oh I see. No I don't, no I didn't." BOLDEN replied, "You a stupid." MALONE replied, "No, nah. Yeah yo, I ain't never go that route feel me?" BOLDEN replied,

"That's why I said who the fuck is this. Can't, can't understand C.H." MALONE stated, "Nah, cause I ain't never go that, go that route. You know what I mean. I ain't, no one never said that little shit to me. Ain't never said shit like that so…" BOLDEN replied, "We all say C.H. We either say C.H. or Brad." MALONE stated, "Alright. Next time I'll already know what it is so you don't have to put that shit out there you know." BOLDEN stated, "Say it again." MALONE stated, "Next time I'll already know what it is so (inaudible) run with it." BOLDEN stated, "Alright, and right now I just pulled up at Brad's. He (S.MALONE) told me to holler at Boo (MCDONALD) again, um [S.MALONE told BOLDEN to resupply MCDONALD with drugs]." MALONE stated, "Alright, I guess I'll holler at you. Oh, damn alright, alright, yo, you alright, alright, alright hold on a minute. Hold just hold tight. I need, I needed to, I guess holler at you about something." BOLDEN asked, "Alright. Where you at?" MALONE stated, "Alright (inaudible) about to come up Fulton." BOLDEN replied, "Alright, so you want me to stay at Brad for a minute." MALONE, "Yeah, hell yeah cause…I um, I need to holler at you real quick." BOLDEN replied, "Alright, I'm right here at Brad." During this call, I believed that BOLDEN was attempting to explain to MALONE that S.MALONE was currently at the "stash" location in Cherry Hill ("C.H."), a neighborhood in south Baltimore. BOLDEN was attempting to utilize coded language to tell MALONE the location of S.MALONE. MALONE did not understand the code ("C.H."). Finally BOLDEN had to tell MALONE the code, and then told him (MALONE) the code "Brad" was for the other stash location at **1911 Braddish Avenue** ("Brad"). BOLDEN told MALONE that he (BOLDEN) was dropping off drugs to "Boo (MCDONALD)" at the Braddish location. MALONE and BOLDEN then agreed to meet at the Braddish Avenue.

10.     On February 23, 2012 at approximately 4:30 p.m., law enforcement established stationary surveillance in the 1900 block Braddish Avenue, and approximately 4:40 p.m., observed a black BMW X5 SUV bearing Maryland registration 9AR6084 pull to the even side of the 1900 block Braddish Avenue.  Maryland Motor Vehicle Administration (MVA) listed the vehicle as a 2006 BMW, registered to Ruth Ann CURTIS, 622 McKewin Avenue Baltimore, Maryland 21218.  At approximately 4:32 p.m., law enforcement observed BOLDEN exit the driver's side door of the BMW SUV and walk to the rear passenger door of the vehicle. BOLDEN allowed a large dog to exit the rear door and subsequently grabbed a black plastic bag from the rear of the vehicle.  BOLDEN then walked to the steps of **1911 Braddish Avenue** and remained on the porch.  At approximately 4:51 p.m., law enforcement observed a black male dressed in a black jacket and gray pants walk to the front porch of **1911 Braddish Avenue**. Subsequently, both BOLDEN and the black male entered **1911 Braddish Avenue**.

11.     On February 23, 2013 at approximately 5:06 p.m., BOLDEN called MCDONALD.  During this call BOLDEN stated, "Yeah (inaudible)."  MCDONALD asked, "Huh?" BOLDEN stated, "Brad."  MCDONALD stated, "Damn, he yo, uh…"  BOLDEN asked, "How long you gonna be?"  MCDONALD stated, "Where you at?"  BOLDEN stated, "I just told you Brad **[1911 Braddish Avenue]**."  MCDONALD stated, "Oh, alright.  I'm a be uh, on my way."  BOLDEN replied, "Huh?"  MCDONALD stated, "On my way now.  Ten, fifteen minutes."  BOLDEN stated, "Alright bet."  During this call, I believed that BOLDEN was telling "Lil Boo (MCDONALD)" that he (BOLDEN) had arrived at **1911 Braddish Avenue** ("Brad") and was awaiting him (MCDONAND, a/k/a "Lil Boo) to arrive so that he (BOLDEN)  could supply him (MCDONAND, a/k/a "Lil Boo) with a quantity of drugs. MCDONALD told BOLDEN that he (MCDONALD) would arrive in ten to fifteen minutes.

12.     On February 25, 2013 at approximately 6:20 p.m., law enforcement conducted a spot check in the area the 1900 block of Braddish Avenue.  While driving through the 1900 block of Braddish Avenue, agents observed BOLDEN exiting the porch of **1911 Braddish Avenue**.  BOLDEN subsequently entered the driver's side of a white 4 door vehicle which was parked on the even side of the 1900 block of Braddish Avenue.

13.     On April 6, 2013 at approximately 10:24 p.m., BOLDEN received a call from telephone number (850)***-2462, another cellular telephone utilized by the male only known as "Scar," who was incarcerated.  During this call "Scar" asked, "Where the fuck you at, home?" BOLDEN replied, "I'm in, I'm down uh Brad **[1911 Braddish Avenue]**."  Scar asked, "I thought, I thought, I thought Braddish was rented out yo."  BOLDEN replied, "It is, upstairs. But me and yo-Harold is downstairs.  Rambo (S.MALONE) down Fair **(2519 West Fairmount)**. And (inaudible) and Snaps (MALONE) down at Fayette."  Scar replied, "Huh?"  BOLDEN repeated, "Rambo and Snaps (MALONE) down at Fair **(2519 West Fairmount)**.  Me and yo-Harold down at Brad **[1911 Braddish Avenue]**, downstairs, upstairs is rented out."  Later in the conversation Scar asked, "What'cha ma call'em uh, Ridgewood rented out?"  BOLDEN stated "Yeah, yeah, yeah.  That been rented out.  That got rented out right after Brad **[1911 Braddish Avenue]** did."  Scar stated, "Oh, alright so that must have gotten rented out right after I got knocked off [arrested] then.  What's up with Pen; Pen **[Penrose (see below)]** ain't finished?" BOLDEN stated, "Man Pen ain't even, I ain't even heard nothing about Pen.  I don't think anybody even working on Pen.  Pen just sittin', laying dormant."  During this call, I believed that BOLDEN was explaining that he (BOLDEN) and an unknown male (yo-Harold) were utilizing the downstairs apartment of **1911 Braddish Avenue** as their residence.

14.    A check of the Maryland Department of Assessment and Taxation (MDA&T) revealed that **1911 Braddish Avenue** is owned by Mark Gatewood and Sharonne MALONE (SH.MALONE), the sister of MALONE.

15.    During the course of this investigation, investigators reviewed court ordered cell site information for BOLDEN's A-Line that has placed BOLDEN, on an almost daily basis, in the area of **1911 Braddish Avenue** prior to his arrest on April 10, 2013.

**B. 4502 Ritchie Highway**, Baltimore, Maryland 21225. (**4502 Ritchie Highway**). Probable cause specific to this location may be found in ¶¶ 16-19.

16.    4502 Ritchie Highway has been identified as an alternative address used by BOLDEN. I am aware that narcotics traffickers often use multiple addresses to conceal their location from law enforcement, and consequently routinely conceal contraband, valuables and other items of evidentiary value at these various locations to avoid the complete loss of all assets should law enforcement execute a search warrant at any one of the multiple locations.

17.    On March 14, 2013 at approximately 11:30 p.m., surveillance units followed BOLDEN, who was operating a white Infiniti bearing Maryland registration 3AX8816, to **4502 Ritchie Highway**. BOLDEN parked his vehicle in the driveway of the residence, which is located in the rear of the location, and entered the rear entrance of the location.

18.    I know that BOLDEN is currently on parole for second degree murder until January 23, 2017. I also know that BOLDEN listed his current address with his parole agent as **4502 Ritchie Highway**.

19.    On several occasions, BOLDEN has been observed operating **Bolden's Lexus**, which is listed, through MVA, to BOLDEN at **4502 Ritchie Highway**.

**C. 1138 Scott Street**, Baltimore, Maryland 21230. (**1138 Scott Street**). Probable cause specific to this location may be found in ¶¶ 20-28.

20.     1138 Scott Street has been identified as a location utilized by BANKS to conduct drug related meetings with MALONE and other members of the DTO.  Additionally, BANKS has been in this location during her efforts to arrange travel for various couriers.

21.     On March 31, 2013 at approximately 8:05 pm, BANKS called the toll free number for an online travel agency.  During this call BANKS made a reservation for BURRELL, who has been identified as a courier for the MALONE DTO, to fly from Baltimore to Phoenix on April 1, 2013.  BURRELL was later observed by law enforcement meeting MALONE at the Phoenix airport.  Beginning on April 9, 2013, BURRELL's cell phone was tracked to various bus stations throughout the country, including Los Angeles, Salt Lake City, and Pittsburg.  She eventually disembarked the bus in Breezewood, Pennsylvania.  Her phone was then observed, via cell site information, to be in the company of BANKS' E-Line, which I knew, through intercepted conversations, during this time was being used by MALONE.  Both phones were then observed, via cell site information, to travel to Baltimore.  While making BURRELL's reservation, BANKS provided a credit card to pay for the flight, and provided her address as **1138 Scott Street**.

22.     On April 18, 2013 at approximately 1:48 p.m., BANKS received a call from MALONE, who was utilizing the J-Line.  During this call a general conversation ensued between MALONE and BANKS.  MALONE and BANKS agreed to meet at BANKS's location.  From the cell towers that BANK's phone was utilizing to communicate with MALONE, I know that BANKS was in the area of **1138 Scott Street**.  During the conversation, MALONE asked "Is there any parking spots in the back though?"  BANKS responded, "Of course. (Inaudible)  You pull into my yard."  MALONE stated, "Oh shit, alright well you gotta, you gotta show me which one."  BANKS replied, "Oh my goodness.  It's all the way down."  The conversation continued

and BANKS provided MALONE directions to park his (MALONE's) car in the rear of **1138 Scott Street**.

23.   On April 18, 2013 at approximately 4:13 p.m., BANKS received a text message from J-Line, utilized by MALONE. The content of the message was: "Comin 15 mins 20." At this time, law enforcement began to conduct surveillance of rear of **1138 Scott Street**. At approximately 4:28 p.m., BANKS sent a text message to telephone number (443)\*\*\*-0593, utilized by BURELL, the courier from the last shipment of cocaine transported from Phoenix, Arizona to Baltimore, Maryland. The content of the message was: "The Boss said he need that girl# y'all talked about that time that was good to go." I believed that during this call BANKS was asking BURELL to provide her (BANKS) the telephone number for another female, who was interested in becoming a courier for the MALONE DTO, whom BURRELL mentioned to MALONE during her (BURRELL's) last trip .

24.   On April 18, 2013 at approximately 4:48 p.m., BANKS received a call from MALONE, who was using J-Line. During the call MALONE stated, "I'm going to be right, fuckin' tomorrow (inaudible) probably got to get in the air right?" BANKS affirmed. MALONE asked, "Did you hear me?" BANKS again affirmed. I believed that during this call MALONE was explaining to BANKS that he (MALONE) was planning to fly from Baltimore to Phoenix ("got to get in the air…").

25.   On April 18, 2013 at approximately 5:05 p.m., surveillance units observed **Bolden's Lexus** parked in the rear yard of **1138 Scott Street**. At almost the exact same time (5:05 p.m.), BANKS received a call from MALONE, utilizing J-Line. During this call MALONE stated, "I'm out back," and BANKS responded "Alright."

26.     On April 18, 2013 at approximately 5:43 p.m., investigators observed MALONE exit the rear of **1138 Scott Street** and after walking around Bolden's Lexus several times MALONE entered the vehicle and left the area.

27.     On April 18, 2013 at approximately 5:55 p.m., BANKS received a text message from telephone number (443)***-4925. The content of the message was: "You hear me calling and knocking at your door." BANKS then sent a text message to the same number. The content of the message was: "No I didn't was with the Boss & washing my hair I told you I wasn't ready yet...I need weed." I believed that these text messages confirmed that MALONE is the head of the MALONE DTO ("the Boss...").

28.     Investigators checked through law enforcement databases and learned that BANKS utilizes **1138 Scott Street** as her current address. I also know after reviewing court ordered cell site information that BANKS is in the area of **1138 Scott Street** on an almost daily basis, which indicates to me that it is her primary residence.

**D.** **2519 West Fairmount Avenue**, Baltimore, Maryland 21223. **(2519 Fairmount Avenue)**.  Probable cause specific to this location may be found in ¶¶ 29-32, 115.

29.     2519 Fairmount Avenue has been identified as one of the multiple locations purchased by the MALONE DTO.  Further, member of the DTO have been observed in and around this address during this investigation.

30.     I have learned from through Maryland Business records that MALONE, and other members of his DTO operate a Limited Liability Corporation (LLC.), named SJM[5] I am aware that one of the many ways that narcotics trafficker launder money is through the purchase of rental properties, which enables the traffickers to appear to have legitimate income either through the actual rental income or "flipping" the houses for a profit. I know from the investigation, and

---

[5]     I believe that the business name is the initials of Shawn Joseph MALONE.

intercepted calls that SJM LLC purchases properties in Baltimore and attempts to rent the properties. A check of the properties owned by SJM LLC revealed the address of **2519 Fairmount Avenue**.

31.   As noted above (¶ 13), on April 6, 2013 at approximately 10:24 p.m., BOLDEN and Scar discussed various properties including an address on Fairmount, "Rambo and Snaps down at Fair [Fairmount]. Me and yo-Harold down at Brad, downstairs, upstairs is rented out." During the call, I believed that BOLDEN was telling Scar that S.MALONE ("Rambo") and MALONE ("Snap") were living on Fairmount ("Fair").

32.   On April 17, 2013, law enforcement conducted surveillance in the 2500 block West Fairmount Avenue. At approximately 11:55 a.m., law enforcement observed S.MALONE and Stephanie EDMONDS standing in front of **2519 Fairmount Avenue**. S.MALONE utilized a key and entered **2519 Fairmount Avenue** followed by EDMONDS. At approximately 11:58 a.m., EDMONDS exited the residence and sat on the steps of **2519 Fairmount Avenue**. At approximately 12:01 p.m., S.MALONE exited **2519 Fairmount Avenue** and entered the passenger side of a blue 2003 BMW bearing Maryland tag 3AR9217[6]. EDMONDS entered the driver's side of the BMW, and both left the area.

E.   **4124 Edmondson Avenue**, Baltimore, Maryland 21229.  (**4124 Edmondson Avenue**). Probable cause specific to this location may be found in ¶¶ 30-32.

33.   4124 Edmondson Avenue has been identified as an alternative address for BANKS. BANKS, during intercepted conversations has provided this address on multiple occasions to member of the DTO.

34.   On April 4, 2013 at approximately 5:58 p.m., BANKS called telephone number (301)***-2499, a telephone being utilized by an unknown male (UM 2499). During this call

---

[6]      The 2003 BMW bearing Maryland tag 3AR9217 is registered to Stephanie Olivia Edmonds (DOB: June 8, 1986) at 165 West Henrietta Street, Baltimore, Maryland 21230

UM 2499 stated, "What's up shorty low?" BANKS replied, "What's up with that B thing?" UM 2499 stated, "I'm on deck. Got it." BANKS replied, "Could you come to me?" UM 2499 asked, "Where you at?" BANKS replied "On Edmondson Avenue, across from the cemetery." UM 2499 asked, "On the top." BANKS replied, "Yeah, 4124." I believe that BANKS was asking UM 2499 to deliver her an amount of drugs ("B thing"). BANKS gave UM 2499 her location as **4124 Edmondson Avenue**.

35.    On April 7, 2013 at approximately 3:34 p.m., BANKS received a call from telephone number (410)***-1234, a phone being utilized by an unknown male (UM 1234). During this call, UM 1234 asked BANKS where he needed to pick her up, and BANKS provided the address **4124 Edmondson Avenue**.

36.    I know from reviewing court ordered cell site information that BANKS is at **4124 Edmondson Avenue** on a frequent basis.

37.    On May 2, 2013 at approximately 7:21 a.m., BANKS received a call from (646)***-8038, a phone utilized by what appeared to be a payroll company. BANKS and the payroll company representative then discussed a price for the payroll company to provide services to BANKS's fictitious salon business. During the call BANKS was asked to provide an address for the business, and BANKS provided 4124 Edmondson Avenue.

F.   **1504 Upshire Road**, APT 1-A, Baltimore, Maryland. (**1504 Upshire Road**). Probable cause specific to this location may be found in ¶¶ 38-44.

38.    1504 Upshire Road has been identified as the residence of GAINES.

39.    A check through law enforcement databases revealed that GAINES is currently utilizing 1504 Upshire Road as his residence.

40.    On February 23, 2013 at approximately 9:48 p.m., BOLDEN called GAINES, using (443)***-6739. During this call an unknown female answered the phone and BOLDEN

asked "Yeah, is Jim [GAINES] home?" The female stated, "Yeah, hold on." Later in the conversation, GAINES took the phone and asked, "What's up with you?" BOLDEN asked, "Hey, I was hollering at you about that thing right?" GAINES asked, "Huh?" BOLDEN stated, "I said I was hollering about that thing. You good on that?" GAINES stated, "Nah, you said what?" BOLDEN stated, "I'm talking about the, the, the little fellow [little gun] uh, uh, I let you hold." GAINES replied, "Oh yeah." BOLDEN stated, "I mean I know you was going through a thing or two [I know you had a few disputes] but uh, I was asking are you good yet [did you resolve them]." GAINES stated, "Nah, uh, uh what you need it [no I have not resolved them I still need the gun]?" BOLDEN stated, "Somebody that, that, that doing something [someone I know has something planned] and yo need something [and he needs a gun] and I really ain't trying to uh, put any old thing up there." GAINES stated, "Alright." BOLDEN stated, "I mean, a, you wanted something tiny [GAINES wanted a small gun] you know what I'm saying?" GAINES stated, "Right." BOLDEN stated, "I got other shit for you [I (BOLDEN) have another gun for you (GAINES)]. That's if you want the other shit. But that's on you, but uh…" GAINES asked, "It's bigger than that one [Is the other gun bigger]?" BOLDEN stated, "Hell yeah. That's the smallest thing I got [the one that you (GAINES) have is the smallest one I (BOLDEN) have]." GAINES stated, "You talking about the one I got right?" BOLDEN stated, "Yeah that's the smallest….You know what I'm saying I got bigger shit [I (BOLDEN) have bigger guns], but I'm saying uh, I can bring you something bigger [I (BOLDEN) can give you (GAINES) a bigger gun]. So…I just um, don't want to put my big shit up there. I know my shit is more safer with you than this mother fucker [my (BOLDEN's) bigger better gun is safer with you (GAINES) than giving it to the unknown individual]." GAINES replied in the positive. BOLDEN stated, "That's what I'm saying. I don't want, I don't want to lose anything [I

(BOLDEN] do not want to lose any gun], but if I got to lose something [but if I'm going to lose one, I'd rather lose the smaller one in your (GAINES) possession than the bigger one] I'd rather lose that little mother fucker as opposed to…" GAINES stated, "Alright, well you already know where I'm at. I'm in the house." BOLDEN and GAINES then agreed to meet later at GAINES residence. I believe that during this call BOLDEN was asking GAINES if he (GAINES) still needed the handgun that he (BOLDEN) had lent him. GAINES indicated that he (GAINES) still needed it, and BOLDEN explained that he (BOLDEN) needed to give him (GAINES) another handgun. BOLDEN explained that he (BOLDEN) had to give a handgun to unknown third person, but did not trust this unknown individual and felt that he (BOLDEN) might not get the gun back. BOLDEN explained that the gun in GAINES's possession was of lesser quality and that he (BOLDEN) would rather give the cheaper gun in GAINES's possession to the unknown third person, and risk losing that one than his (BOLDEN's) bigger better gun.

41. Within a few minutes, on February 23, 2012 at approximately 9:57 a.m., BOLDEN called GAINES. During this call BOLDEN asked, "You not in the house?" GAINES replied, "I'm in here." BOLDEN stated, "Man I've been standing out in your hallway since we got off the phone yo. And I knocked on your door and all that shit. So I'm like what the fuck. I don't see your car so I'm like maybe he ain't in the house." GAINES replied, "Alright where you at?" While BOLDEN was ending the call he (BOLDEN) could be overheard talking to GAINES in the background stating, "Man I was mother fucking knocking." I know from previous surveillance of **1504 Upshire Road**, that BOLDEN's conversation was consistent with the description of **1504 Upshire Road**. I also know from the court ordered cell site locations from BOLDEN's cellular telephone that during this call BOLDEN was at **1504 Upshire Road**.

42.    On March 22, 2013 at approximately 7:30 a.m., law enforcement conducted spot surveillance at **1504 Upshire Road**. During the surveillance several vehicles were parked in close proximity to the apartment. Law enforcement ran those vehicles through the MVA and learned that 2007 Toyota with Maryland registration A250187 was registered to Ashley GAINES at **1504 Upshire Road**. The Toyota was co-owned by Travis GAINES with an address of 6680 Collinsdale Rd Apt C in Baltimore, Maryland.

43.    On March 26, 2013 at approximately 8:00 a.m., law enforcement established stationary surveillance at **1504 Upshire Road**. At approximately 8:10 a.m., law enforcement observed movement at the left inner door of the apartment building, Apartment 1A, at **1504 Upshire Road**. At approximately 8:11 a.m., law enforcement observed a juvenile with a backpack, a female and GAINES exit the main door for the aforementioned apartments. The female and the child walked towards the white Toyota Solara and GAINES walked to an unidentified vehicle that was double parked, and appeared to be waiting for GAINES.

44.    On April 25, 2013, an administrative subpoena was served upon the management company for **1504 Upshire Road,** who confirmed that GAINES and Ashley GAINES are the current residents of **1504 Upshire Road** and have been there since October 2011.

**G. 4039 Twin Circle Way**, Baltimore, Maryland 21227. (**4039 Twin Circle**). Probable cause specific to this location may be found in ¶¶ 45-50.

45.    4039 Twin Circle has been identified as an alternative residence for MALONE, his girlfriend's residence. As noted, narcotics traffickers routinely utilize multiple addresses to conceal their location, assets, and contraband from law enforcement. Alternative locations for narcotics traffickers are often the homes and apartments of girlfriends and other companions.

46.    Law enforcement databases confirmed that Brittany JONES, MALONE's girlfriend, utilizes **4039 Twin Circle** as her residence.

47.    On March 8, 2013, law enforcement established surveillance in the 4000 block Twin Circle Way, and observed Brittany JONES exit the front door of **4039 Twin Circle** carrying a car seat. JONES approached a white Mercedes bearing Maryland tag 5AS5473 . JONES placed the car seat in the rear passenger seat of the Mercedes Benz, entered the driver's seat, and left the area. MVA has no record for the Mercedes bearing Maryland tag 5AS5473.

48.    On April 25, 2013, investigators subpoenaed Baltimore Gas and Electric Company (BG&E) service record for **4039 Twin Circle,** and learned that the account is in the name of Angelita Monique DAVENPORT since August 16, 2012. I know from law enforcement databases that DAVENPORT is associated with SJM LLC.

49.    Additionally, JONES is listed as a corporate officer of SJM LLC.

50.    Recently, MALONE has been observed operating a grey Toyota registered to NextCar. On April 30, 2013, I served an administrative subpoena on NextCar Rental Car for all business records related to the vehicle in MALONE's possession  I then learned that NextCar utilizes GPS technology on most of their rental vehicles and that their system captures the vehicle location every morning. This location information is than maintained by NextCar in the business records for the individual vehicles.   As a result, I learned that beginning on approximately April 15, 203 that MALONE had rented the NextCar vehicle, the vehicle was, on an almost daily basis, in the area of **4039 Twin Circle,** the address of MALONE's girlfriend, Brittany JONES.

**H. 10624 High Beam Court**, Columbia, Maryland 21044. (**10624 High Beam**).  Probable cause specific to this location may be found in ¶¶ 51-55.

51.    On April 2, 2013 at approximately 10:50 p.m., BOLDEN called S.MALONE. During this call BOLDEN asked S.MALONE if he was "already out there?"  S.MALONE stated he was and BOLDEN stated that he would meet him there in approximately thirty minutes.  At

approximately 11:56 p.m., BOLDEN called S.MALONE. During this call BOLDEN asked S.MALONE to text him (BOLDEN) the address, and S.MALONE provided the address **10624 High Beam**.

52.     I conducted a search through law enforcement databases and learned that MALONE has been stopped by police on several occasions, and as recently as March 18, 2013 in Howard County Maryland, while operating a blue Acura SUV bearing Maryland registration 9AS2763. I learned through MVA that this vehicle is registered to Sharonne MALONE at **10624 High Beam**.

53.     On April 16, 2013 at approximately 11:00 a.m., a spot check was conducted on **10624 High Beam**. During this check, the blue Acura SUV bearing Maryland registration 9AS2763 was observed parked in front of **10624 High Beam**.

54.     On April 30, 2013 at approximately 2:30 p.m., I observed MALONE's NextCar parked outside of **10624 High Beam**.

55.     Additionally, SH.MALONE, MALONE's sister, is as a corporate officer in SJM LLC. On March 13, 2013 at approximately 1:13 p.m., BOLDEN called telephone number (240)***-9756, utilized by SH.MALONE. During this call BOLDEN stated, "Yeah, but ain't nobody moving in, I talked to Shawn [MALONE], we was by there..." SH.MALONE stated, "Shit man, somebody is in here. An old lady and her mother." BOLDEN stated, "Oh yeah?" SH.MALONE stated, "Man and Stephanie got her name and stuff on here. I don't know what the fuck they doing. But I'm about to take my name off this house. For real, they not doing it right." BOLDEN's response is inaudible. SH.MALONE stated, "No Manny name wasn't even supposed to be on it." BOLDEN replied, "Yeah, I don't know." SH.MALONE stated, "He's dumb." BOLDEN stated, "There's still mad food in there. He ain't never get that food out the

fridge and stuff." SH.MALONE stated, "Well Stephanie let somebody move in here. They got a lease. They already paid. There's furniture and all that shit is in there." BOLDEN stated, "Oh yeah." SH.MALONE, "They are living in the stop floor. An older lady, about forty something years old and her mother, about seventy." BOLDEN stated, "What you talking about? You talking about Braddish or Ridgehill?" SH.MALONE stated, "I'm talking about Braddish." BOLDEN stated, "Oh yeah, yeah, yeah. I already know somebody living up there. Oh I thought you…" SH.MALONE stated, "But somebody moved into Ridgewood. Somebody moved into Ridgehill too." BOLDEN stated, "When? Because me and Shawn (MALONE) were just by there last night." SH.MALONE stated, "Friday." BOLDEN replied in the positive. SH. MALONE stated, "Over this weekend somebody moved in. Stephanie and Manny are doing whatever they want to do. They moving people in there. BOLDEN stated, "Oh." SH.MALONE stated, "They not even consulting with people that's owners and part owners of the business." BOLDEN stated, "Yeah, well I…" SH.MALONE stated "(inaudible) Just doing whatever they want. But at the end of the day how can you write a lease and say pay the money to Stanley Malone slash Stephanie Edmonds when you're not the owner. And how can you put Shawn (MALONE) name on it." BOLDEN's response was inaudible. SH.MALONE asked, "What is you all doing?" BOLDEN stated, "I wouldn't of had nothing to do with that. I mean I didn't know that's what they doing." BODLEN stated, "But I heard him on the phone with her the other day talking about yo well such and such and such, I'm going to give you back your money, man we partners. I'm saying to myself; partners?" SH.MALONE stated, "This is what I'm trying to tell you." BOLDEN stated, "Fucking idiot man." SH.MALONE replied, "Fucking idiot. Her name is all up and down the only thing good about it is she trying to play games. I can re-write that lease because I am the owner. But I'm not going through that. Cause he never

had her do the shit. You understand what I'm saying?" BOLDEN stated, "Yes." SH.MALONE continued, "And further more if you went in and if you told me that this is mine, why is your name still on this?" BOLDEN responded in the positive. SH.MALONE stated, "Your name not supposed to do nothing with nothing why your name on the lease? Why your name on the lease? As the owner. Your not the owner. I'm the owner. Basically I got fucked out of the deal. Basically." BOLDEN's response was inaudible. SH.MALONE stated "This house is supposed to be mine's right here. This is the house I was supposed to eat [make money] from. So basically she gettin' all the checks. And they eating from all the houses, and what we getting? What we getting?" BOLDEN stated, "He's an idiot." SH.MALONE stated, "The checks are going in Stephanie and Manny name. What the fuck is we getting out of it?" SH.MALONE stated, "He was supposed to do that shit. Missy you ain't never worry about paying your bills. Your going to be straight. We gonna move somebody in there that's going to be you monthly income. Yeah. How the fuck that's supposed to be my monthly income, and you and Stephanie taking that seven hundred dollars a month." BOLDEN stated, "Seven hundred?" SH.MALONE stated, "Said seven hundred dollars for that apartment a month." BOLDEN stated, "On Braddish?" SH.MALONE stated "Yeah."

I.   **1601 Burnwood Road**, Baltimore, Maryland 21239. (**1601 Burnwood**). Probable cause specific to this location may be found in ¶¶ 56-61.

56.    1601 Burnwood has been identified as yet another alternative address for BOLDEN, his girlfriend's address.

57.    I know from the court ordered cell site information of BOLDEN's phone, that BOLDEN, prior to his incarceration, often spent the night in the area of **1601 Burnwood**.

58.    On March 14, 2013 at approximately 7:30 p.m., law enforcement established surveillance at **1601 Burnwood**. Upon arrival, law enforcement observed a white Infiniti

bearing Maryland tag 3AX8816 parked in front of **1601 Burnwood**. At approximately 8:05 p.m.,

BOLDEN was observed exiting the rear of **1601 Burnwood** walking two dogs, and entering the

Infiniti.

59.     Law enforcement databases revealed that a female named Katoya HARVELL is

the current resident at this location. I located a telephone associated with HARVELL, 443-***-

1308, and learned that HARVELL's phone had been in contact with BOLDEN approximately

seven hundred times. During several of these conversations, BOLDEN referred to the user of

(443)***-1308 as "Toya," As a result, I believed that after listening to these conversations, that

HAVELL is BOLDEN's girlfriend, and that his (BOLDEN's) son lives with HARVELL at **1601**

**Burnwood.**

60.     On April 1, 2013 at approximately 2:33 a.m., BOLDEN called HARVELL.

During this call BOLDEN stated, "Man I just got pulled over, I got a big ass three fifty seven

[.357 caliber handgun] under my thigh and I'm high as shit, so I'll call you back and let you

know what happened." HARVELL stated, "Oh my fuckin' god Demo [BOLDEN], don't do that

shit." BOLDEN stated, "I got that shit sittin' right under my lap. I ain't trying to stash it or

nothing. I just got it under my lap. They ain't going to tell me to get out cause the mother

fuckin' insurance, the registration, everything in my name. They ain't going to tell me to get out,

don't worry about it. If they tell me to get out and shit, I'm trying to merc this bitch, I'm going

to try and...cause he by himself." HARVELL stated, "Yeah, just keep calm..." BOLDEN

stated, "Matter fact he already got my license, I can't do nothing to him. But you know...if he

tell me to get out I'm not getting out. I'm fighting." I believed that during this call BOLDEN

was advising HARVELL that he (BOLDEN) was currently stopped by law enforcement and was

armed with a .357 caliber handgun. BOLDEN told HARVELL that if the officer attempted to

have him exit his (BOLDEN's) vehicle he was going to harm the officer ("merc").  BOLDEN

then realized that the officer already had his (BOLDEN's) license and that was unable to harm

the officer, but that he (BOLDEN) was still going to "fight" the officer, if he was asked to exit

the car.

61.    On April 12, 2013, at approximately 7:59 p.m., BOLDEN who is currently

incarcerated on a parole violation, made a call from a correctional facility to telephone number

(443)***-1308, a telephone being utilized by HARVELL.  During this call, HARVELL told

BOLDEN that "Lil Demo" will give her the "whole thing" of "$2,540."  HARVELL stated that

his [Lil Demo's] was packaged the same way as he received it.  BOLDEN then told HARVELL

to go and get it and "put it in the house [**Burnwood**, HARVELL's house] and put it away."

BOLDEN stated, "eighteen of six" and "keep the six and the odd forty."  I believed that during

this call BOLDEN was giving directions to HARVELL to take packaged cocaine and money

from "Lil Demo" and store it inside of **1601 Burnwood Avenue**.

J.  **922 North Rosedale Street**, Baltimore, Maryland 21216.  (**922 Rosedale**) Probable cause specific to this location may be found in ¶¶ 62-66 and

K.  **924 North Rosedale Street**, Baltimore, Maryland 21216.  (**924 Rosedale**)  Probable cause specific to this location may be found in ¶¶ 62-66.

62.    922 and 924 North Rosedale have been identified as two locations utilized by

CHASE.

63.    On March 13, 2013 at approximately 12:26 p.m., BOLDEN received a call from

(443)***-8301, utilized by CHASE.  During this conversation CHASE asked, "Where you at?"

BOLDEN replied, "Out front."  CHASE stated, "You out the front of my house already?"

BOLDEN replied, "I was getting ready to text, to call you and tell you to open the door."

CHASE replied, "Alright I'm about to be right there, I'm about to catch a hack.  I'm down the

way." I know from court ordered cell site information over BOLDEN's phone that he (BOLDEN) was been in the area of 922 and 924 Rosedale Street at the time of this call.

64.    I conducted a check through law enforcement databases and learned that CHASE had been arrested as recently as February 13, 2012 and provided his home address as **924 Rosedale**. On October 1, 2011, CHASE was stopped during a traffic stop and provided a false name and date of birth.  CHASE was arrested after being positively identified and law enforcement learned of an open arrest warrant for failure to pay child support. I also learned that that on December 19, 2012 CHASE reported his address as **922 Rosedale**.

65.    On April 9, 2013, law enforcement conducted surveillance in the 900 block of North Rosedale Street. At approximately 8:55 a.m., law enforcement observed CHASE exit the front door of **922 Rosedale**. CHASE jumped off the porch of **922 Rosedale** and climbed onto the porch of **924 Rosedale**. CHASE utilized a key and entered **924 Rosedale** leaving the front door ajar. At approximately 8:58 a.m., CHASE exited **924 Rosedale**, utilized a key to lock the door and walked back to **922 Rosedale**. At approximately 8:59 a.m., a black female wearing hospital scrubs exited **922 Rosedale** followed by CHASE. CHASE then utilized a key to lock **922 Rosedale**, and all three individuals walked to a white Chevy SUV bearing Maryland tag 8AP6895. CHASE entered the driver's side while the female and the juvenile entered the passenger side of the vehicle, and left the area. MVA lists the white Chevy SUV bearing Maryland tag 8AP6895 to Gail Roxanna Brown at **924 Rosedale**.

66.    I believe that CHASE is utilizing both 922 and 924 Rosedale Street.

**L. 1908 Penrose Avenue**, Baltimore, Maryland 21223. **(1908 Penrose)**.  Probable cause specific to this location may be found in ¶¶ 67-68.

67.    1908 Penrose is another property owned by SJM LLC.  This location is in high crime area with multiple open air drug markets.  The property appears to be vacant, but I am

aware that narcotics traffickers often utilize vacant locations to stash street-level quantites of

drugs for distribution, as well as firearms to protect the illegal street activity.

68.    On April 6, 2013 at approximately 10:24 p.m., BOLDEN received a call from

telephone number (850)***-2462, utilized by "Scar" who is currently incarcerated (See ¶¶ 12) .

During a portion of the call, "Scar" asked, "What's up with Pen; Pen ain't finished?" BOLDEN

stated, "Man Pen ain't even, I ain't even heard nothing about Pen. I don't think anybody even

working on Pen. Pen just sittin', laying dormant." I believe that during this conversation

BOLDEN was explaining to Scar that no one was currently living in **1908 Penrose**, and that it

still needs to be rehabbed. BOLDEN also revealed that the DTO was not making any money

from the rent of Penrose

M. **1803 Dunmere Road**, Dundalk, Maryland 21222. (**1803 Dunmere**). Probable cause
   specific to this location may be found in ¶¶ 69-76.

69.    1803 Dunmere has been identified as the residence of REYES.

70.    I learned through law enforcement databases that REYES was a victim of

domestic violence in 2007, and that the suspect in that dispute was REYES' girlfriend Jacqueline

WHITE. I further learned through law enforcement databases that WHITE was currently

utilizing the address of **1803 Dunmere**. Through surveillance of REYES, and court ordered cell

sites, I learned that REYES is staying at **1803 Dunmere**.

71.    On March 23, 2013 at approximately 10:44 p.m., BOLDEN called telephone

number (443)***-9680, utilized by REYES. During this call REYES stated, "Go ahead unc."

BOLDEN stated, "Yeah where you at baby?" REYES stated, "Oh shit, Jim (GAINES) already

came and scooped that up." BOLDEN stated, "You was all in?" REYES stated, "No I still had

some left (inaudible) probably call you tomorrow shorty to have you come pick that shit up." I

believe that members of the MALONE DTO contacted REYES to pick up money from any sales

of the cocaine that was provided to him on consignment. REYES informed BOLDEN that "Jim (GAINES)," already picked up the money. REYES informed BOLDEN that he (REYES) still had a little cocaine left and should have the rest of the money for him (BOLDEN) the next day.

72.     On March 23, 2013 at approximately 10:44 p.m., BOLDEN called GAINES. During the call BOLDEN stated, "Yo I just hollered at Shorty (REYES) and he said you (GAINES) already came through and shit. Cause I was runnin' to him but you just saved me a trip. Because I (BOLDEN) been done supposed to, (inaudible) we were supposed to hook up around four o'clock. But he (REYES) had over slept so...then I (BOLDEN) hit him again I (BOLDEN) was like give me about a half. So I got my kids and shit so I just called him now and where you at cause I'm trying to make this (unaudible). He was like Jim already came through, and I was like perfect." GAINES replied, "Right, right, I got you buddy."

73.     On March 23, 2013 at approximately 10:50 p.m., BOLDEN called GAINES. During the call BOLDEN stated, "uh, uh, uh, you know he had a uh, he had a dollar on top of the (inaudible) right?" GAINES replied, "Huh?" BOLDEN stated, "I said he had a dollar on top of that (inaudible)?" GAINES replied, "You said a dollar?" BOLDEN stated, "Yeah. That's why I had, I had to stay on top of him. See yo got a habit of shorting a nigga a dollar every trip, right?" GAINES replied, "Right." BOLDEN stated, "So I'm saying he owed a dollar on top of a (unaudible) So how sure are you that?" GAINES replied, "Yeah he still paid. That's what he said, he still; he only gave me nine cents for real, so he still, he didn't even give me the whole thing. So whatever he still owes he probably gotta give it all at once." BODLEN stated, "That's what I'm saying what, what, what did he give up?" GAINES replied, "He gave me nine cents." BOLDEN replied, "That's it." GAINES stated, "Yeah but that's, that's, that's not right for no (inaudible)." BOLDEN stated, "He said..." GAINES interjected, "That's right cause he said he

only had a uh, uh, a donut and a half [an ounce and a half of cocaine] left." BOLDEN stated, "Right." GAINES stated, "That ain't uh, oh, yeah, yeah, yeah, that's right once he does that." BOLDEN stated, "Right." GAINES stated, "But whatever you said that supposed to be our twenty six cent that he owe." BOLDEN stated, "Ok cause I know, uh, all together it should be eleven eight." GAINES stated, "Right, right, right." BOLDEN stated, "Everytime yo got to have it, or try you know alright yo, I'm going to bring it back nah, nah this shit, we still need that dollar from last shit you know what I'm saying?." GAINES stated, "Right, right, right. Yeah you can let him know though. He gotta give us our twenty six cent." BOLDEN stated, "Alright I'm on it." I believe that during this call BOLDEN and GAINES were working out the amount of money owed to them by REYES for drugs that were previously "fronted" to REYES. I believe that the MALONE DTO provided REYES with ten ounces of cocaine and it appeared that REYES paid $9,000 (nine cents) to GAINES, and BOLDEN was explaining that he (REYES) owed another $1,000 from the last amount that the DTO provided. GAINES advised BOLDEN that REYES was still in possession of one and a half ounces of cocaine ("...a donut and a half left."). GAINES and BOLDEN agreed that the amount still owed by REYES was $2600 ("twenty six cent").

74.    On March 30, 2013 at approximately 8:09 p.m., BOLDEN called REYES. BOLDEN asked, "What's up baby?" REYES stated, "What's good I'm out here, I'm ah soon as I pile it up [count it] I'm a hit ya." BOLDEN asked, "What's up?" REYES repeated, "I said I'm out here I just came out here as soon as I pile it up I'm a hit ya." BOLDEN replied, "I'm right with that alright." REYES stated, "Alright." During this call, I believe that REYES was telling BOLDEN that he was currently counting all of the drug proceeds and would be ready to meet

with BOLDEN later. Court ordered cell site information placed REYES in the vicinity of **1803 Dunmere**.

75.   On April 16, 2013 at approximately 2:20 p.m., BOLDEN called REYES. During this call REYES stated, "I'm leaving the county now yo be there like, eleven." BOLDEN replied, "Alright where you same spot…by the Ritz?" REYES stated, "Hold up um, nah shorty dropped (inaudible)." BOLDEN asked, "He what?" REYES stated, "I said he dropped me off where I be at." BOLDEN stated, "Alright, oh, oh, oh, oh, oh, you talking 'bout ahh, ahh, the little spot…past Patterson Park." REYES stated, "Yeah." BOLDEN replied, "Alright, alright, alright, bet I'm a ready start making my way that way, alright shorty?" REYES stated, "Alright." I believe that during this call REYES was telling BOLDEN that he was at **1803 Dunmere** ("…leaving the county") and would be traveling to meet with BOLDEN to complete a drug transaction.

76.   On April 29, 2013 at approximately 12:30 p.m., surveillance was conducted at **1803 Dunmere**. At approximately 1:46 p.m., Jacqueline WHITE was observed exiting the rear of **1803 Dunmere** and entering a black Toyota, bearing a Maryland temporary registration, and departing the area. At approximately 2:33 p.m., WHITE returned and parked the vehicle in the rear of **1803 Dunmere**. Once parked, investigators observed REYES exit the rear of **1803 Dunmere** and enter the Toyota and departed the area.

N. **6145 Quiet Times**, Columbia, Maryland. (**6145 Quiet Times**). Probable cause specific to this location may be found in ¶¶ 77-82.

77.   **6145 Quiet Times** has been identified as the residence of MCDONALD.

78.   On April 21, 2013, at approximately 4:27 p.m., MCDONALD called telephone number (443)***-7551, utilized by an unknown male (UM 7551). During this call, UM 7551 asked MCDONALD his location. MCDONALD advised UM 5571 that he was by the dumpster

in the "hole" and to "come on." UM 7551 then started yelling "Girls, Girls, Girls" and the call

ended. I know that "girl" is a street term used to describe cocaine. I also learned through this

investigation that MCDONALD operates a cocaine distribution network in the area of West

North Avenue and Lennox Street in Baltimore City utilizing unknown male's to distribute the

cocaine. I believe that during this call; UM 7551 had persons that wanted to purchase cocaine

and that UM 7551 was asking MCDONALD his location so he (UM 7551) could direct the

buyers to MCDONALD. It is common practice in Baltimore for drug dealers to utilize "touters."

"Touters," a street term used to describe a person that arranges the sale of narcotics, walk around

the neighborhood directing buyers to the location of the seller. Often these "touters" yell the

description of the product, in this case "girl [cocaine]" and the location, for example, "girl in the

alley."

79.    On April 22, 2013, at approximately 12:03 p.m., MCDONALD called

S.MALONE, who was utilizing (240)***-6500. During this call, MCDONALD advised

S.MALONE that he (MCDONALD) was on "nine." I know that it is common practice for

persons that operate a street shop to keep tract of the number of packs that they sell in a day.

Typically, packs consist of twenty-five individual units of drugs, and are packaged in a clear

sandwich baggie. Based on information learned throughout this investigation, I believe that

MCDONALD actively operates a "street shop" in Baltimore on a daily basis and was advising

S.MALONE as to the amount of narcotics that he (MCDONALD) had sold that day.

80.    On April 24, 2013, at approximately 12:35 p.m., MCDONALD received a call

from telephone number (443)***-7252, utilized by an unknown male (UM 7252). During this

call. UM 7272 told MCDONALD that he (UM 7252) was around the way. MCDONALD asked

UM 7252 if they (MCDONALD and UM 7252) could meet at Mondawmin because he did not

want to meet UM 7252 there.  I believe that during this call, UM 7252 was in the area of MCDONALD's street shop and was contacting MCDONALD to obtain a supply of narcotics. MCDONALD did not want to meet UM 7252 in the area of his street shop to remain discreet.

81.      At various times during this investigation, MCDONALD has been observed operating a 2003 BMW X5 bearing Maryland tag 9VV3797.  MVA lists the BMW X5 to Tiria Maria BROADNAX at 5361 Racegate Run, Columbia, Maryland 21045.  I have learned through law enforcement databases that BROADNAX current address is **6145 Quiet Times**.  I know through court ordered cell site information that MCDONALD's phone is in the area of **6145 Quiet Times** on an almost daily basis.

82.      On April 24, 2013 at approximately 10:30 a.m., surveillance was established at **6145 Quiet Times**.  Upon arrival at the location, law enforcement observed MCDONALD's BMX X5 bearing Maryland registration 9AV3725 parked in front of the location.   At approximately 11:45 a.m., law enforcement observed MCDONALD exit **6145 Quiet Times,** enter the BMW and leave the location.

## V.      PROBABLE CAUSE

### A.      BACKGROUND

83.      In December 2011, the DEA began an investigation into the MALONE DTO, based in Baltimore, Maryland.   During the initial stages of this investigation, investigators learned from a cooperating source, who provided information to law enforcement in exchange for leniency in criminal charges, that MALONE was meeting with sources of supply of cocaine in Texas and Arizona, and utilizing females to courier the cocaine on buses to Baltimore, where members of the organization would distribute the cocaine.

84.     In January 2013, surveillance was conducted of MALONE in Phoenix, Arizona, where he was in the company of several females.  Law enforcement positively identified one of the females as LaToya MACK and after a brief period of time in Phoenix, MALONE transported MACK to the Greyhound Bus station in Phoenix, Arizona, where investigators observed MACK, who was carrying a pink suitcase and a carry-on bag, board a bus destined for Baltimore.  After several days, investigators interdicted MACK in Fredrick, Maryland prior to her arrival in Baltimore.  During this encounter, MACK fled the scene, but left her belongings including the pink suitcase and carry-on on the bus.  Law enforcement seized her property and executed a search warrant on her belongings.  During the search, law enforcement recovered approximately 1.5 kilograms of cocaine from the carry-on bag, as well as MACK's identification from the same bag.

85.     In February of 2013, the DEA commenced the interception of wire and electronic communication of BOLDEN, the user of A-Line and MCCRAY, the user of B-Line, over their cellular telephones after identifying them as members of the MALONE DTO.  Based upon conversations intercepted over BOLDEN's phone, law enforcement identified BOLDEN as a wholesale supplier of cocaine.  Customers of BOLDEN were identified as MCDONALD, the user of I-Line, REYES, and CHASE.  Through these intercepted calls, other members of the MALONE DTO were identified.  These members include S.MALONE (H-Line), who assists BOLDEN with the street-level distribution of cocaine, as well as the collection of money; BANKS, the user of E-Line, who arranges the travel of the multiple couriers utilized by the DTO; and BURRELL and RICHARDSON, who are both couriers that were traveling to Phoenix, Arizona to smuggle drugs to Maryland.  Finally, investigators identified the source of supply of cocaine for the MALONE DTO, IRIS Last Name Unknown (LNU), the user of F-Line.

**B.      BOLDEN, MALONE, S.MALONE and MCDONALD discuss street-level drug sales**

86.      On February 19, 2013 at approximately 2:33 p.m., BOLDEN called MALONE, who was using (410)***-1607.  During this call BOLDEN stated, "What's up with your bitch ass, man.  I didn't have no, I didn't have no way to reach you.  I was just waitin' on you to holler at me."  MALONE's response was inaudible.  BOLDEN continued, "I've been calling.  I've been calling checkin' up on Man-Man [S.MALONE] and shit."  MALONE stated, "(Inaudible) been out of town and shit.  Yo uh, whoo-whoo."  BOLDEN stated, "Right."  MALONE stated, "Yeah."  BOLDEN's response was inaudible.  MALONE stated, "Hey, yo, once I get the kids (inaudible) school (inaudible)."  BOLDEN responded, "I'll meet you down, I'll see you down Braddish [**1911 Braddish**]."  MALONE stated, "Or else, or else you can just go ahead and call (inaudible)."  BOLDEN stated, "Alright, well whatever.  You call him.  I'm getting ready to call yo.  Find out what's up."  MALONE stated, "Alright, I mean, Alright."  I believed that during this call BOLDEN and MALONE were discussing plans to meet.  During this call, BOLDEN stated "I've been calling, I've been calling checkin' up on Man-Man [S.MALONE] and shit."  MALOLE's responded, "(Inaudible) been out of town and shit.  Yo, uh, whoo-whoo."  I believed that during this call BOLDEN was trying to meet with MALONE regarding a drug transaction.  MALONE stated during the call that he (MALONE) was "out of town," which I believed was a reference to traveling to Arizona or Texas to purchase cocaine.  When MALONE exclaimed "whoo whoo," I believed that he (MALONE) was telling BOLDEN that he (MALONE) successfully obtained drugs during his trip out of town.

87.      Immediately following the preceding call, on February 19, 2013 at approximately 2:34 p.m., BOLDEN called MCDONALD a/k/a "Lil Boo."  While the phone was ringing, BOLDEN was overheard talking to an unknown individual in the background stating, "He

supply the shit, so..." During the conversation, BOLDEN told MCDONALD, "Lil Snaps [MALONE] told me to call you, I need to see you." BOLDEN and MCDONALD agreed to meet and BOLDEN asked, "Our normal spot, by the alley?" MCDONALD told BOLDEN to call him (MCDONALD) when he (BOLDEN) was close and he (MCDONALD) would direct him (BOLDEN) to the spot he (MCDONALD) wanted him (BOLDEN) to meet. I believed that BOLDEN was telling MCDONALD that he (BOLDEN) was coming to meet him (MCDONALD) to re-supply him with drugs and to collect drug proceeds. I believed that BOLDEN had learned from MALONE that he (MALONE) had obtained drugs and was attempting to contact MCDONALD, who ran the DTO's street shop, to supply MCDONALD drugs for distribution. Throughout this investigation, law enforcement has observed the operation of MCDONALD's street-level drug shop. On a nearly daily basis MCDONALD is in the vicinity of Lindon Avenue and Lennox Streets, conducting drug transactions.

88.     On February 19, 2013 at approximately 2:45 p.m., BOLDEN received a call from telephone number (410)***-9191, utilized by S.MALONE. During this call BOLDEN stated, "I said Snaps [MALONE] just hit me. He (MALONE) told me (BOLDEN) to go holler at Boo [MCDONALD] and he hit you (S.MALONE), or uh, get with you (S.MALONE) and we would all hook up as soon as he (MALONE) waitin' on the kids to get out of school." S.MALONE replied, "you got it, so a nigger waitin' on you for real." BOLDEN replied, "Oh, so you what you want? You want me to come through?" S.MALONE replied, "Yeah, I mean you got to do them [process/package the drugs for street sales], I mean, I mean, you got to do them up." BOLDEN then told S.MALONE that he (BOLDEN) would do that and meet him (S.MALONE) at "Brads" (**1911 Braddish**) as soon as he (BOLDEN) met with "Lil Boo (MCDONALD)." I believed that during this conversation S.MALONE was explaining to BOLDEN that he

(BOLDEN) had to process the drugs before beginning the daily sales, so he (BOLDEN) should go directly to **1911 Braddish** so that they (S.MALONE and BOLDEN) could begin packaging, and processing the drugs and not wait for MALONE.

89.     Based upon this series of calls (see also ¶ 8), I believed that BOLDEN transported drugs to 1911 Braddish and provided those drugs to MCDONALD, who operates the DTO's street level drug distribution shop.

### C.     MALONE DTO attempts to obtain resupply of cocaine

90.     On February 26, 2013 at approximately 12:22 a.m., BOLDEN called telephone number (443)***-4349, utilized by an unknown male (UM 4349). During the call BOLDEN told UM 4349 the he (BOLDEN) had heard UM 4349 had been looking for him (BOLDEN). BOLDEN stated, "I haven't hollar'ed at old girl [cocaine] yet. But I got old boy [heroin], you know." UM 4349 stated that he (UM 4349) was trying to "bust a move [conduct a drug transaction] on old girl [cocaine] real quick." BOLDEN asked, "On old boy [heroin] or old girl [cocaine]?" UM 4349 stated, "Yeah, on old girl [cocaine]." BOLDEN told UM 4349 that as soon as he (BOLDEN) knew something he (BOLDEN) would contact him (UM 4349). I knew that "girl" is a coded term used by drug traffickers to refer to cocaine, and that "boy" is a coded term used by drug traffickers to refer to heroin. I believed that during this call BOLDEN was telling UM 4349 that he had heroin for sale but did not have any cocaine.

91.     Meanwhile, on February 26, 2013, I learned through intercepted telephone calls, surveillance, and information from airline companies that MALONE traveled to Las Vegas, Nevada. I observed through cell tower information from a court ordered pen register that MALONE's telephone number (443)***-1671 was in Las Vegas, Nevada. On February 27, 2013, I learned that MALONE's telephone number (443)***-1671 was in Phoenix, Arizona. I

believed that MALONE had traveled to Phoenix, Arizona to obtain kilogram quantities of cocaine, and that based upon BOLDEN's inability to supply UM 4349 that the DTO was running low on their supply of cocaine ("girl").

92.     Further, on February 27, 2013 at approximately 2:45 p.m., BOLDEN called MCCRAY, who was using D-Line. During the call MCCRAY stated, "Come on man, please let me know something man [please tell me you have drugs]. Shit is getting on my nerves." BOLDEN replied, "the only thing that I can let you know is, you know, we waiting [the DTO is waiting to be resupplied in Arizona]." MCCRAY stated, "Hurry up man. Press up on something, you know what the fuckin' weekend is man. You know what this week is." I believed that during this call MCCRAY was inquiring whether MALONE had returned from Arizona with a new supply of cocaine. BOLDEN told MCCRAY that he (BOLDEN) was still waiting for MALONE to obtain drugs ("only thing that I can let you know is, you know, we [the DTO] waiting"). MCCRAY then expressed frustration that without a fresh supply of drugs he (MCCRAY) would be unable to take advantage of the increased amount of money his customers would have because it was the beginning of the month. I know that the beginning of the month is important to street level drug distributors because individuals receiving financial assistance from the State of Maryland receive their monthly checks at the beginning of each month.

93.     On February 27, 2013, I contacted members of the Phoenix Arizona Office of the DEA, who located MALONE operating a Ford Mustang rental vehicle with California registration 6WRZ101. Investigators learned from the rental company that this vehicle was rented by MALONE and BANKS on February 26, 2013 in Las Vegas, Nevada and was due back in Las Vegas on March 1, 2013. I also learned that MALONE provided two cellular telephone numbers on the rental agreement, (443)***-7744 and (443)***-8553.

94.    On March 1, 2013, I, along with members of the Phoenix DEA, conducted surveillance on MALONE in Arizona. At approximately 4:23 p.m., MALONE, utilizing C-Line, received a text message from F-Line. The content of the message was: "Hey can u come 2 my place in 30 minutes...!! "K." Immediately thereafter, MALONE, using C-Line sent a text message to F-Line. The content of the message was: "K." Because F-Line had a 602 area code, I believed that MALONE was meeting with a local individual in Arizona. At approximately 4:55 p.m., law enforcement observed MALONE exit his hotel and enter his vehicle alone. MALONE was followed to the apartments at 2408 West Myrtle Avenue in Phoenix, Arizona. Prior to going into the parking lot, MALONE drove past the entrance and continued several blocks, pulled over, and then conduct a U-turn and drove back to the apartment entrance. Law enforcement observed MALONE park at the apartments and greet two Hispanic female, who were in a tan Chevy Blazer bearing Arizona registration ARH9091. MALONE and the two females then walked toward the inner courtyard of the apartments out of view. A query of Arizona Department of Motor Vehicles revealed that the Chevy Blazer was registered to Janeth HAROS-Monge. Investigators conducted a social media search of a page created by HAROS-Monge with photos and confirmed that it was the same female that greeted MALONE. Law enforcement observed all three subjects enter Apartment number "52," and noticed all three individuals appeared to be looking over their shoulders as they approached the apartment, which I believed was an effort at counter-surveillance. Additionally, I observed that the cell tower information for the F-Line was in the same location as C-Line, which I knew was utilized by MALONE. As a result, I believed that the user of F-Line was in the company of MALONE. At approximately 5:33p.m., MALONE exited apartment "52" and walked toward his vehicle. At

approximately 5:34 p.m., MALONE was observed MALONE entering his vehicle and departing the parking lot. MALONE was lost shortly thereafter on I-17.

95.    On March 1, 2013 at approximately 6:02 p.m., MALONE using C-Line, received a call from S.MALONE, who was using (276)***-3444. During this call, MALONE and S.MALONE discussed their efforts to exchange phone numbers in a secure manner.

96.    On March 3, 2013 at approximately 3:10 a.m., BOLDEN called RICHARDSON. During this call BOLDEN stated, "Hey, yeah, I just talked to my peoples right?" RICHARDSON responded in the positive. BOLDEN stated, "Six o'clock, six o'clock too late, so I'm gonna try to get one for like uh, for about twelve noon." RICHARDSON responded "Alright." BOLDEN asked, "Are you still on deck, on board?" RICHARDSON stated, "Yes." BOLDEN continued to tell RICHARDSON that he wanted her to text him her information to include her full name and birth date so he could book the flight. I knew, at the time of this call, MALONE was in Phoenix, Arizona attempting to obtain cocaine. I also knew that the MALONE DTO employed females to transport the cocaine from Phoenix, Arizona to Baltimore, Maryland. And I believed that during this call, BOLDEN was recruiting RICHARDSON to become a courier for the organization.

97.    On March 3, 2013 at approximately 3:10 a.m., BOLDEN received a text message from RICHARDSON. The content of the text message was: "Ashley Richardson 9301992". I believed that RICHARDSON was sending her personal information to BOLDEN to complete the process for purchasing airline tickets, so RICHARDSON could travel to Phoenix and meet MALONE.

98.    On March 6, 2013 at approximately 12:17 a.m., BOLDEN called RICHARDSON. During this call BOLDEN stated, "Yeah you good?" RICHARDSON

responded, "Yeah. Who's this?"  BOLDEN responded "D [Demo]."  RICHARDSON asked, "Who?"  BOLDEN stated, "I just realized that the other phone turned off, that's why I called you from this phone."  RICHARDSON responded, "What phone, who you looking for?"  BOLDEN responded, "Man, this Ashley?"  RICHARDSON responded, "Yeah."  BOLDEN responded, "Alright, this Demo."  RICHARDSON responded in the positive.  BOLDEN stated, "I figured if I said D you would catch on because I didn't want to say my name."  RICHARDSON apologized.  BOLDEN stated, "I'm saying, I just tried to call you from the other phone because I haven't heard from her, and just be checking on you."  RICHARDSON stated, "I called you last night."  BOLDEN responded, "Right, but listen to me though, I be checking on you here and there.  But because I haven't heard from you I just now picked up that other phone and tried to call you but it said it didn't have any minutes on it."  Later in the conversation RICHARDSON stated, "I need some minutes on my phone.  My phone gets cut off tonight."  BOLDEN stated, "Alright tell, tell my nephew."  RICHARDSON stated, "Alright."  BOLDEN stated, "Alright, well just hollar at him.  He'll take care of it.  You ain't gotta want for nothing.  You need some minutes, he'll get you some minutes.  You good.  Trust me, you in good hands down there if it wasn't all good.  You know, next time you'll probably be down there with me because we usually swap.  We normally don't stay at the same places at the same time.  So after he get tired of being there, he gonna wanna come here, and I'm gonna have to switch with him."  RICHARDSON responded in the positive.  BOLDEN asked, "Are you good though?"  RICHARDSON responded, "Yeah, I can't wait for him to (inaudible)."  BOLDEN stated, "Yeah I'm gonna get it done.  I'm gonna on his ass and tell him to get it done A-SAP."  Later RICHARDSON stated that this was not what she thought it was going to be.  She thought she was going to be able to go "shopping" and see the city.  BOLDEN stated, "That's, that's why, he

probably got you cooped up in a room right?" RICHARDSON responded in the positive. BOLDEN stated, "You got to realize right that that's probably the best way for you right." The conversation continued about the amount of money RICHARDSON was going to make for working with the organization. I believed that during this call BOLDEN was checking on the status of one of the couriers for the DTO, RICHARDSON, who had traveled to Phoenix, Arizona and was believed to be in the company of MALONE. I also believed that RICHARDSON would eventually be utilized to transport cocaine to Baltimore, Maryland.

99.    On March 10, 2013 at approximately 10:50 a.m., BOLDEN called RICHARDSON. During this call BOLDEN asked, "Where you at, what happened, why you move?" RICHARDSON replied, "I mean D (Demo), but it's like oh my god I'm so stressed like?" BOLDEN replied, "I already know, I already know. This what I need you to do. I don't know what's going on but he is on his way. I just got off the phone with him. He said to tell you to go back to where you came from. (Inaudible) go back to where you came from. He on his way right now. (Inaudible)." RICHARDSON stated, "But I was, yes I understand. But um, I want you to talk to my mother too. Cause I was lettin' her know everything. But I really want you to talk to my mother. Um, um, but it's like I was in the middle of nowhere. I'm right here in line waiting to talk to the supervisor. Get a number and an address or whatever. But it's not my fault." BOLDEN replied, "So why don't you go the route you came?" BOLDEN replied, "He don't know where you are now, but he knows where you came." RICHARDSON replied, "That's the thing. I really don't know where. I just know I was in the middle of nowhere." BOLDEN asked, "Alright do you know where you are at now?" RICHARDSON replied, "Yes." Later, BOLDEN instructed RICHARDSON to text him her location.

100.   On March 10, 2013 at approximately 10:54 a.m., BOLDEN called telephone number (240)***-2537, utilized by RICHARDSON's mother (UF 2537).  During this call UF 2537 stated, "Hey what's up?  You talk to Ashley?"  BOLDEN stated, "Yeah, I just got off the phone.  She told me to call you.  What's going on?"  UF 2537 stated, "Ok, well what happened, what she is telling me, and I seen the pictures she pasted on there, when she got on a bus at Salt Lake City, Salt Lake City to Denver, the fuckin' bus caught on fire.  And I said well, did you have your luggage on the um, in the carry all on top of you, or she said it was in the back.  Cause it was to big to put over top of her or whatever.  And she got the number but I said yo do not come back here without an incident report and get all that shit. Cause when I talked to her Friday she was saying shit fucked up.  But I'm like are you good and she like yeah.  Well I said just be careful, you know what I'm saying, slow roll and just make it home.  So now she sittin' here finally telling me, like she sent us the pictures of the bus.  But we sayin' the bus on fire, we didn't (talks in background), we didn't see the extent of it.  So now, I just told her to get the incident report and everything. I just tried to call them but the place closed until tomorrow at eight o'clock.  I told her she is stuck there.  Until she gets this shit straight.  And I said why did you all, why did you all separate, you know what I'm saying.  She said because the first bus crowded, the first bus was full so he got on one bus and she got on another bus.  And the bus she got on caught on fire."  Later in the conversation UF 2537 stated, "She said she in a, she in Denver right now.  Denver, Colorado.  And the bus she got on, the bus she got on that caught on fire was in Salt Lake City."  I believed, based upon these calls that the Greyhound bus transporting RICHARDSON and the cocaine had caught on fire somewhere between Salt Lake City, and Denver, Colorado.  I then conducted a search of the internet and learned from the Craig

Daily Press that on March 8, 2013 a bus traveling from Salt Lake City to Colorado Springs, Colorado caught fire at approximately 2:19 p.m.

101. On March 14, 2013 at approximately 6:17 p.m., BOLDEN called MCCRAY, who was using the D-Line. During this call MCCRAY stated, "God damn, I said my nigga don't even fuck with me that's all." BOLDEN replied, "It ain't, it ain't even that man. If you even knew half the shit I've been going through yo, it's like one thing after another yo. One thing after another. You already know the last shit that happened [MACK left the drugs on the bus and fled from the police]. Do you know that something else just happened? The other day?" MCCRAY replied, "I'm sure that shit just go down the drain my nigga." BOLDEN asked, "Huh?" MCCRAY stated, "Shit just be going down the drain for a nigga." BOLDEN replied, "Man, who you tellin'. (Inaudible)." MCCRAY replied, "You need to get yourself a J-O-B." BOLDEN replied, "I'm talkin' about, I'm talkin' about (yells as "Maxine" in the background). I'm talkin' about another demonstration [quantity of drugs] yo. A whole joint [a kilogram]." MCCRAY stated, "Oh man yo." BOLDEN stated, "Guess what, guess what?" MCCRAY stated "Yeah." BOLDEN stated, "The hound [the Greyhound bus]." MCCRAY stated, "Yeah." BOLDEN continued, "Caught on fuckin' fire. What are the chances of that yo. Fuck the police and all that shit. The fucking hound caught on fire yo. You listening to me yo, you know how sad, how fucked up I was all day?" MCCRAY stated, "Damn." BOLDEN stated, "The fucking hound caught on fire are you listening?" MCCRAY replied, "Yeah." BOLDEN stated, "Don't say nothing don't say nothing to nobody." MCCRAY stated, "Yeah." BOLDEN continued, "That shit is crazy, do you hear what I'm saying." MCCRAY replied, "Yeah man." BOLDEN stated, "Yo what the fuck? That shit has never happened." MCCRAY stated, "Damn." BOLDEN replied, "Yeah so I mean...you know I'll definitely, I'll definitely need, I'll definitely

holler at you right. Cause ah, you know I ah, I'll either holler at you up close. I can't do too much talking over this phone but (inaudible)." I believed that during this call BOLDEN was referring to the seizure of 1400 grams of cocaine from MACK on January 29, 2013 in Frederick, Maryland ("One thing after another. You already know the last shit that happened. Do you know that something else just happened? The other day?"), and the recent bus fire that caused the DTO to lose another kilogram of cocaine ("a whole joint").

   **D.    HOWARD MCCRAY, a/k/a "Pooh"**

   102.   On February 19, 2013 at approximately 8:22 p.m., MCCRAY, using B-Line received a call from telephone number (410)***-3109, utilized by a female known only as "Ms. Gloria." During this call, Ms. Gloria stated that she is getting ready to walk up to his house to see him. At approximately 11:00 p.m., MCCRAY, using B-Line received another call from "Ms. Gloria." During this call, Ms. Gloria stated, "Hey Pooh, I'm right here at your house. I'm getting ready to come up on you porch. I want two. MCCRAY stated, "Alright." I believed that during this call MCCRAY was getting ready to sell "two" units of drugs to Ms. Gloria from his residence.

   103.   On February 20, 2013 at approximately 2:29 a.m., MCCRAY, using B-Line, received a call from telephone number (443)***-9786, utilized by an unknown female (UF 9786). During this call UF 9786 stated, "Hey Pooh, this um Shorty. You good?" MCCRAY stated, "Yeah. What's up?" UF 9786 stated, "I need one. I'm down the street." MCCRAY stated, "Alright. Come to the porch." I believed that during this call MCCRAY was directing UF 9786 to his residence at **1712 Mooreland Avenue** to supply her with an amount ("one") of drugs.

104.    On February 20, 2013 at approximately 3:43 a.m., MCCRAY, using (B-Line), received another call from Ms. Gloria, using telephone number (410)***-3109. During this call Ms. Gloria asked, "Yeah you still up?" MCCRAY stated, "Yeah I'm up. What's up?" Ms. Gloria stated "I just want one. I'm getting ready to walk up there." Again, I believed that during this call MCCRAY was selling an amount of drugs ("one") to Ms. Gloria from his residence at **1712 Mooreland Avenue**.

105.    On February 22, 2013 at approximately 9:49 p.m., BOLDEN received a text message from MCCRAY using D-Line. The content of the message was: "U got." At approximately 9:50 p.m., BOLDEN sent a return text to the same number. The content of the message was: "Nah...n process." I believed that this series of text messages involved MCCRAY trying to determine if BOLDEN had re-upped his supply of drugs ("U got'). BOLDEN then responded that he (BOLDEN) had not yet obtained drugs, but was in the process of getting more ("Nah...n process").

106.    On February 22, 2013 at approximately 9:50 p.m., BOLDEN called MCCRAY, who was using the D-Line. During this call BOLDEN asked, "You in the house?" MCCRAY replied that he was, and BOLDEN asked, "I need to swing through, right. I need to grab that bag out the basement." MCCRAY acknowledged, and BOLDEN and MCCRAY agreed to meet at MCCRAY's residence. I believed that during this call BOLDEN was attempting to obtain contraband that he (BOLDEN) stored in MCCRAY's residence, **1712 Mooreland Avenue**.

107.    On February 25, 2013 at approximately 5:41 p.m., MCCRAY, using B-Line, called (443)***-6492, utilized by an unknown male (UM 6492). During this call UM 6492 stated, "Man I still got the same thing. But I been on the uh, you feel me, hitting mother fuckers on the twenty five cent piece [a quantity of drugs]." MCCRAY responded, "Oh, shit. Alright,

alright. I'll come up there." UM 6492 stated, "Cause I was waiting on that dude Ray. But I'm up uh, what's it name, Mondawmin. What's it name, about to come down." MCCRAY stated, "Alright, well uh, just hit my phone when you get back to the house." I believed that MCCRAY was contacting UM 6492 in an attempt to collect money owed to MCCRAY from drugs that were "fronted [provided on consignment]" to UM 6492. I believed that UM 6492 was explaining that he (UM 6492) still had the same amount left, but was selling larger amounts "twenty five cent piece." MCCRAY and UM 6492 then agreed to meet at UM 6492's residence.

108. On February 27, 2013 at approximately 2:53 p.m., MCCRAY, using B-Line received a call from telephone number (410)***-9683, utilized by a an unknown male (UM 9683). During this call UM 9683 asked, "Where you at Bro, I'm trying to get some of that shit." MCCRAY responded, "Hell yeah." UM 9683 stated, "Shit where you want to meet at so we can uh, bust a move [conduct drug business]." MCCRAY stated, "As soon as I get back from the job and hit that clock." UM 9683 stated, "Oh you get off at eight o'clock?" MCCRAY stated, "Nah, about four or five o'clock." I believed that during this call UM 9683 was attempting to meet MCCRAY to purchase an quantity of drugs. MCCRAY, who works at University of Maryland, advised UM 9683 that he (MCCRAY) would meet him (UM 9683) once he finished work.

109. On February 27, 2013 at approximately 5:43 p.m., MCCRAY, using B-Line called telephone number (410)***-0744, utilized by an unknown female (UF 0744). During this call, an unknown male answered the phone, and MCCRAY asked to speak to "Pam." MCCRAY identified himself "Pooh." A female then answered the line and MCCRAY stated, "Pam this is Pooh, bring the pistol and come on." UF 0744 replied, "Huh?" MCCRAY stated, "This is Pooh. Bring your thing [gun] and come here." UF 0744 stated, "Ok baby, here I come." I believed that

during this call MCCRAY was asking UF 0744 to bring a firearm to MCCRAY, who was outside UF 0744's location in a vehicle.

110.    On February 28, 2013 at approximately 1:33 p.m., MCCRAY, using B-Line, called telephone number 443-447-6492, utilized by an unknown male (UM 6492).  During this call MCCRAY stated, "Yeah, cause I need a what's it name, a, a, a vic.  But I'm at work though. I'm at work, you know I work at University hospital."  UM 6492 replied, "Oh yeah."  MCCRAY stated, "Yeah, my buddy needed one, one of my co-workers."  UM 6492 continued to tell MCCRAY that he (UM 6492) only had a half of one left.  MCCRAY and UM 6492 agreed to meet and MCCRAY told UM 6492 to come to Pratt and Paca Streets to complete the transaction. I know that a "vic" is a coded term used to describe seven (7) grams of marijuana.  The term "vic" is utilized because Michael Vick, a professional football player, wears jersey number "7."

111.    On March 1, 2013 at approximately 10:59 p.m., MCCRAY, using B-Line, called telephone number (609)***-9014, utilized by an unknown male (UM 9014).  During this call UM 9014 asked, "Hey, you uh, you uh, uh you got a (inaudible) yo?"  MCCRAY replied, "Yeah, I'm at the house."  UM 9014 asked, "You know what I said?". MCCRAY replied, "Yeah.  I said I'm at the house, but I don't got that."  UM 9014 stated, "Shit.  Damn.  That's what I need bad." MCCRAY replied, "I ain't got.  But I got, I got, I got something though."  UM 9014 stated, "Yeah but not nothing to sell?"  MCCRAY stated, "Yeah.  Everything put together."  UM 9014 asked, "Anything not put together?"  MCCRAY stated, "Huh?"  UM 9014 asked, "You ain't got a piece?"  MCCRAY responded in the negative.  I believed that during this call that UM 9014 was attempting to purchase a quantity of drugs from MCCRAY that had not been processed ("put together") for street distribution.   MCCRAY  stated that all of the drugs in his

(MCCRAY's) possession at his residence, **1712 Mooreland Avenue**, were already processed and packaged for street sales.

112. On March 14, 2013 at approximately 3:52 p.m., MCCRAY, using D-Line called telephone number (410)***-4588, being utilized by an unknown female (UF 4588). During this call MCCRAY complained about not having any money. Later in the conversation MCCRAY stated, "I was trying to make a sale or two man." UF 4588 replied, "Huh?" MCCRAY stated, "I said I was trying to make a sale or something man." UF 4588 asked, "What a (inaudible)?" MCCRAY replied, "I was trying to make a sale. A crack [crack cocaine] sale." UF 4588 stated, "I said for what; to get something to eat or for to get some gas?" MCCRAY replied, "Money period man. I got this shit, I'm just sitting here sitting on this shit. I'm ready to get rid of this shit man." UF 4588 replied in the positive. MCCRAY stated, "I ain't fuckin' with this shit no more man. One minute they like to the coke, one minute they don't. Fuck it." UF 4588 replied, "That ain't the same stuff though is it?" MCCRAY stated, "Nah, I got this stuff from Duck man." I believed that MCCRAY during this call was complaining about his lack of money. MCCRAY explained that he was in possession of a large amount ("I'm just sitting here, sitting on this shit") of crack cocaine ("crack"), and that he was waiting to sell it. MCCRAY then complained about the quality of the cocaine. I believed that MCCRAY had obtained this inferior cocaine from an alternative source of supply ("Duck man") because he (MCCRAY) was unable to obtain better quality cocaine from the MALONE DTO, who had a recent string of setbacks in obtaining cocaine.

**E. STANLEY MALONE, a/k/a "Man Man"**

113. On February 23, 2013 at approximately 2:25 p.m., BOLDEN called S.MALONE, who was using (410)***-9191. During this call S.MALONE told BOLDEN that he

(S.MALONE) needed to see him (BOLDEN), and was asking for a "ten piece" from BOLDEN, and that "Boo (MCDONALD) ready." I believed that during this call S.MALONE was asking for a specific quantity of drugs and that MCDONALD ("Lil Boo") was also ready to be re-supplied with drugs from BOLDEN.

114.   On March 31, 2013 at approximately 5:46 p.m., BOLDEN called H-Line, utilized by S.MALONE. During this call BOLDEN stated, "This dude saying he just waking up, and that he gonna have something for him tomorrow." S.MALONE asked, "Who?" BOLDEN stated "Rico (REYES)." S.MALONE stated, "Man we going to (inaudible). Boo (MCDONALD) yo." BOLDEN replied, "Who and Boo?" S.MALONE asked, "Huh?" BOLDEN stated, "Oh Jim (GAINES) too?" S.MALONE stated, "Yeah, Jim (GAINES) too. But Jim (GAINES) only had like twenty five right now. Jim (GAINES) still had, he is about to hold up (inaudible)." BOLDEN replied, "This what I'm saying. A nigga need three fifty." S.MALONE stated, "Huh?" BOLDEN replied, "A nigga need three fifty to uh, to uh, to coop, to fly the coop." S.MALONE stated, "What I'm trying to say is Boo (MCDONALD). Boo (MCDONALD) got a you know what I'm saying?" BOLDEN replied, "Alright did you call, did you reach the nigga?" S.MALONE stated, "Yeah, I'm waiting on him to call me, he ain't calling me yo." I believed that during this call BOLDEN and S.MALONE were discussing their individual customers ("Boo (MCDONALD)" and "Rico (REYES))". that have outstanding drug debts. They (S.MALONE and BOLDEN) also discussed "Jim's (GAINES's)" outstanding drug debt. During the conversation, BOLDEN explained that the courier needed another $350 to catch the flight to Phoenix, Arizona ("A nigga need three fifty to uh, to uh, to coop, to fly the coop.").

115.   On April 3, 2013 at approximately 6:39 p.m., BOLDEN called S.MALONE, who was using H-Line. During this call BOLDEN stated, "Man I've been trying to reach you

without, without coming up there right?  But the other number you had ain't on no more.  Cause

Snaps [MALONE] wants you to go to…"  S.MALONE stated, "I see."  BOLDEN asked, "You

already talked to Snaps (MALONE)?"  S.MALONE stated, "Yeah, he told me a little, he told me

he need twenty two dollar ($22,000) for real, for real."  BOLDEN stated, "Man he told me.."

S.MALONE stated, "I'm going to pawn my jewelry tomorrow.  We'll get it."  BOLDEN stated,

"He want, he want, he said uh, uh, uh, he wants you to go hollar at momma.  At that spot, you

was trying to tell me about when I, remember when I went east?  He said no, Man Man

(S.MALONE) knows where it at.  Alright, well he said you would send me.  I'm trying to uh,

reach Stephanie to either she can run you, or you can take her car he wants you to uh, go hollar at

her.  I've been texting uh, uh, uh Rico (REYES) trying to a, a, a see what's the deal with him.  A

couple odds and ends that's odd to me I'm trying to collect that and shit.  So…I'm trying to have

everything done by ten.  I don't know how much I can accumulate but I'm uh, try and get it

done."  S.MALONE stated "(Inaudible) so I can pawn this shit.  Yo, if push comes to shove I'm

just going to pawn my shit."  BOLDEN stated, "Well I'm saying, if that's the case, then I'm, I'm

going to do the same thing then."  S.MALONE stated, "Nah shit, I'll have enough to do that shit

with my shit, I'm getting ready to get enough."  BOLDEN stated, "I'm just saying shorty, if it

come down to it, then that's what it is.  You know, I'm with that.  Whatever, whatever, we gonna

get it done."  S.MALONE stated, "Well we go to do something.  So what you gonna meet up

with me or something and shit?"  BOLDEN stated, "Yeah."  S.MALONE stated, "Well you can

come to the Cherry Hill house then."  BOLDEN stated, "I'm going to hit you at like nine, ten

o'clock."  S.MALONE stated, "Yo, where yo-harold, I'm trying to, I need to get in Fairmount

**[2519 West Fairmount]**."  BOLDEN stated, "Yo-Harold is with his daughter."  I believed that

during this call BOLDEN and S.MALONE were discussing the situation involving MALONE,

who was in Phoenix, Arizona, attempting to purchase cocaine. I believed that MALONE had contacted S.MALONE and BOLDEN to instruct them that he needed $22,000 more than he (MALONE) had to complete the cocaine transaction in Arizona. S.MALONE and BOLDEN then discussed ways each was attempting to acquire the money needed for the cocaine, including S.MALONE pawning his jewelry.

      F.     **LOUIS REYES, a/k/a "Rico"**

     116.    On March 22, 2013 at approximately 10:56 p.m., BOLDEN called REYES. During the call BOLDEN asked, "Yo, what's up nigga?" REYES responded, "I only got like two left for real. BOLDEN then stated, "I heard that I heard ahh I need to see you or you want me to hold tight? REYES answered, "Hold tight, I'ma (inaudible) tomorrow be ready definitely by the usual time." During this call, I believed that BOLDEN was asking REYES if he had sold all the drugs he (BOLDEN) had fronted (provided on consignment to REYES), so that he (BOLDEN) could collect the proceeds. REYES then told BOLDEN that he (REYES) had "two left," but he (REYES) would be ready the next day." Additionally, this call demonstrated the on-going drug relationship between BOLDEN and REYES because REYES told BOLDEN that he (REYES) would be ready at the "usual time," an indication that the relationship is continuous.

     117.    On March 26, 2013 at approximately BOLDEN received a text message from (443)***-9680, utilized by REYES. The content of the text message was: "IM at da hospital bm had Lil contractions I talk 2 man [S.MALONE] told him I need 2 days cause I had to brake (sic) it down dats da only way -,-(?)" I believed that during this message REYES was advising BOLDEN that he (REYES) needed additional time to sell the quantity of drugs in his possession because he "had to brake (sic) it down," in other words, REYES broke the larger quantity of drug

in his possession and was selling smaller units, which was taking him longer than selling the larger quantities.

118.    On April 6, 2013 between approximately 4:05 p.m., and 4:11 p.m., BOLDEN and REYES exchanged a series of text messages. At approximately 4:05 p.m., REYES sent a text message to BOLDEN, "Don't think I 4got shit just slow imma hit u Tue wit something." BOLDEN responded at approximately 4:06 p.m., "U kilt me...I thought we were on da same page..."MONEY BRING POWER." REYES then sent another text at approximately 4:11 p.m., "We are but having to start from da bottom killed me." I believed that during this series of text message REYES was telling BOLDEN that, while he had been delinquent in repaying the debt for drugs that BOLDEN had "fronted" him, REYES was aware of the debt; was not avoiding BOLDEN; and planned to repay at least some of the money on Tuesday. BOLDEN then responded that REYES's failure to pay on time was causing BOLDEN problems ("U kilt me). REYES then told BOLDEN that they (BOLDEN and REYES) were both working together and understood their drug relationship ("on the same page"), but REYES indicated that drug sales and the collection of money were slow ("shit slow"). REYES also indicated that something (arrest, seizure, theft) caused him (REYES) to lose either a significant amount of money or drugs, which required him to have to recoup his loses and begin to pay his debts ("having to start from the da bottom killed me").

G.    DONTE CHASE, a/k/a "Turbo"

119.    On February 20, 2013 at approximately 6:40 p.m., BOLDEN called CHASE. During the call CHASE asked, "What it do baby?" BOLDEN responded, "I'm just trying to find out." CHASE replied, "Same bullshit yo." BOLDEN replied, "Yeah man. None of them niggas (inaudible) nothing yo?" CHASE replied, "Uh-uh. Somebody seen (inaudible). He said his

phone ain't right. He was looking for me. But (inaudible)." BOLDEN then received a call from telephone number (443)***-9716, believed to be utilized by Scar. BOLDEN stated, "Hold on this Scar yo, Hold on." BOLDEN then switched to the other call. Scar stated, "Yeah what's up with you?" BOLDEN stated, "Shit I'm up. I got a call yo, a nigger trying to go. So, I ready to get my ass up now and shoot over Braddish Street [**1911 Braddish**]." Scar's response was inaudible. BOLDEN then stated, "I said I'm getting ready to get myself up, and get myself together so I can shoot over to Braddish." Scar replied, "Alright." BOLDEN stated, "I'll grab you after I stop over at Braddish first cause you know, I'm going to be dirty [I'm going to have drugs on my person]. I need to stop first." Scar stated, "Alright, that's what's up." BOLDEN then returned to the original call. BOLDEN stated, "Yeah. I'm saying that are you ready to see me yet though?" CHASE replied, "Not yet." BOLDEN stated, "Alright. Yeah, I was just talked to you peoples. He said he was on the phone with you, talking about he ran into lil, lil whatcha' ma' call it, uh, um, I forgot lil shorty's name, man. Lil Kool aid." CHASE replied, "My lil cousin?" BOLDEN replied, "Not, not, not kool aid, um, yeah, yeah, yeah that was Kool aid." CHASE replied, "That was A.C." BOLDEN stated, "Yeah. Yeah, yeah I ran into him and he a, he a, he put me on with Arron, said he was a, Derek's son. I said ok." CHASE replied, "Yeah, yeah, yeah. That is Kool aid." BOLDEN replied, "Yeah, yeah, yeah I ran into him. You know what I'm saying?" CHASE replied, "Yeah." BOLDEN stated, "I said you don't know who I am. You was a baby but I know who you are. Kool Aid know who I talking about, the nigger Arron." CHASE replied, "Yeah." BOLDEN stated, "I didn't mean, uh, I didn't mean I supposed to go meet him in a few. I'm getting ready to get myself up now. That's why I was calling you to see if you was ready. So I can make one trip." CHASE replied, "I ain't even ready. I was going uh, I was gonna ask him what he was talking about." BOLDEN stated, "Oh,

he already hollered at me. I'm getting ready to go see him in a minute." CHASE replied, "I know. Once he uh, told me he was on the other line with you, uh I said alright." BOLDEN stated, "Yeah, yeah, yeah. Yeah he said a du-whop [a ounce of cocaine]. So..." CHASE stated, "Right. I couldn't get his number I lost his number yo. I would have been at him. I would have been, you know what I mean?" BOLDEN replied, "Alright, so you want me to have him come see you?" CHASE stated, "That's cool." BOLDEN stated, "Alright, well, hold on cause um, I just told him, uh, I just told him ten five [$1050 an ounce of cocaine]. Nigga said, nigga said he been paying twelve [$1200 an ounce of cocaine]. I told him ten-five." CHASE stated, "Right, I know. I know, he told me." BOLDEN replied, "Yeah that's crazy." CHASE stated, "I know that's my peoples too." BOLDEN stated, "Yeah, I already know. I already know (inaudible). CHASE stated, "Yeah." BOLDEN stated, "Um, hold on let me look in the phone so I can give you his number real fast." CHASE stated, "I got it." BOLDEN stated, "Oh. Alright cause he told me he was just on the phone with you." CHASE stated, "Right." BOLDEN stated "Alright, well call him and tell him to come see you. That will save me a trip and need me, need me to do nothing. You go handle that shit." CHASE replied, "Right, the whole time that's what I trying to tell you." Later BOLDEN stated, "Well he said, he said, he said, he said he trying to get a du-who, and he said he getting ready to bust another move and call me back cause he might need another du-whop." CHASE stated, "I'm about to holler at him right now." BOLDEN asked, "Can you, I'm saying, can you cover all that before I uh..." CHASE stated, "Yeah. I'm good, I'm good, I'm good." I believed that this call with CHASE was a reference to the call with UM 3597, who was attempting to meet BOLDEN to purchase an amount (du-whop) of drugs from BOLDEN. I believed that BOLDEN took the call from Scar to advise him that he (BOLDEN) would pick him (Scar) up after he (BOLDEN) dropped the drugs at **1911 Braddish** ("I'll grab

you after I stop over at Braddish first cause you know, I'm going to be dirty. I need to stop first."). I believed that UM 3597 was actually CHASE's, who was supplied drugs by BOLDEN. During the call BOLDEN explained to CHASE that he (BOLDEN) had already successfully negotiated the price of a "du-whop" for "ten-five". Finally, BOLDEN asked CHASE if he (CHASE) had enough supply of drugs to cover the transaction with UM 3597, and CHASE acknowledged that he did ("Can you, I'm saying, can you cover all that before I uh...," CHASE then replied, "Yeah. I'm good, I'm good, I'm good.").

120.    On March 1, 2013 at approximately 12:26 a.m., CHASE called BOLDEN. During the call CHASE told BOLDEN, "I still need to see him [A], but I went down, you feel what I am saying, So I can't yeah I mean, I told you that when I was there with you." BOLDEN replied, "Yeah, we going to have to talk on the close up, because right now we [the DTO] are trying to get right [we are trying to collect all the money we can] right, and for us to get right we trying to grab the rest of that you know what I'm saying and the bread [money] so we can do what needs to be done [pay for drugs in Arizona]. If you ain't right you going to have to get yourself right the next trip. There is going to be a next trip." I believed that during this conversation CHASE was explaining to BOLDEN that he (CHASE) was attempting to collect drug debts that he (CHASE) owed to BOLDEN, but had not managed to collect from everyone. BOLDEN explained that he (BOLDEN) needed all of the money ("bread") and that he (BOLDEN) may not be ready to re-up his (CHASE's) supply of cocaine unless CHASE repays in a more timely fashion.

121.    On March 11, 2013 at approximately 7:33 p.m., BOLDEN called CHASE. During the call, BOLDEN asked, "I mean gotdamn what's happening....can a nigga come through and see you, can I come see you or what [can I come get the money you (CHASE) owe

me (BOLDEN)). CHASE responded, "Ah, yo, l uh mean, ya mean, for real for real...you feel me?" BOLDEN responded, "Nah." CHASE asked, "You know what I'm talking about right?" BOLDEN answered, "Nah, I'm trying to find out." CHASE stated, "what you asked me to do right?" BOLDEN asked, "Yeah, you talking about big girl [cocaine]?" CHASE responded, "Yeah, and what else I had told you right?" BOLDEN answered, "Nah, what else you told me? I'm lost, I'm lost from that point yo [your effort at using code is confusing me]?" CHASE responded, "About the um...blue ribbon bread [money]." BOLDEN asked, "Blue ribbon bread?" CHASE stated, "About the two loaves of bread that me and you was talking about." During this call, I believed that BOLDEN called CHASE to ascertain whether CHASE had collect more drug proceeds. CHASE advised BOLDEN that he (CHASE ) had $2000 for BOLDEN ("two loaves of bread").

### H.    MAY 8, 2013

122.    On May 8, 2013 your Affiant learned through surveillance that Shawn MALONE, and Melvina BANKS, along with a unknown black male, traveled to the Charlotte Douglas International Airport located in Charlotte, North Carolina. Through intercepted calls over BANKS' E-Line, your Affiant learned that MALONE was parking his vehicle in a long term parking lot at the location. Your Affiant learned through an intercepted call to BANKS that MALONE was about to depart on a flight, and was checking with BANKS to find out if she had made contact with Lexis BURREL, a known drug courier that the MALONE DTO has utilized in the past to transport cocaine from Phoenix, Arizona back to Baltimore, Maryland. BANKS advised that she was still trying to get in touch with her. MALONE inquired if BANKS had scheduled a flight for herself and she stated that she had.

123.    On May 8, 2013, I learned through surveillance that MALONE, and BANKS, along with a unknown black male, traveled to the Charlotte International Airport.  Through intercepted calls over BANKS's E-Line, I learned that MALONE was parking his vehicle in a long term parking lot at the location.  I also learned through an intercepted call to BANKS that MALONE was about to depart on a flight, and was checking with BANKS to find out if she had made contact with BURRELL, one of the couriers that the MALONE DTO has utilized in the past to transport cocaine from Phoenix to Baltimore.  BANKS advised that she (BANKS) was still trying to get in touch with her (BURRELL).  MALONE inquired if BANKS had scheduled a flight for herself (BANKS) and indicated that she (BANKS).

124.    On May 8, 2013 at approximately 5:42 a.m., HORAZ / IRS LNU, utilizing F-Line, received a text from telephone number (410)***-6232, a phone currently being utilized by MALONE.  The content of the message was: ":-) i miss u so much? 2 day???"  I knew from previous intercepted communication between HORAZ and MALONE that the two have developed a code that when MALONE sends a smiley face in a tex that MALONE, and members of this DTO are traveling to Phoenix, Arizona to purchase kilogram amounts of cocaine to be transported back to Baltimore, Maryland for distribution.

## V.    CONCLUSION

125.    Based on the information set forth in this affidavit, I believe probable cause exists to arrest and/or search the TARGET SUBJECT, as well as to search the SUBJECT LOCATIONS and SUBJECT VEHCILES for fruits and instrumentality of a conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

## VI.    CELLPHONES

126.    In addition, due to the prevalence of cellular telephones in this investigation and my training and experience, which indicates that narcotics traffickers utilize cellular telephones, communication devices, and other electronic media storage devices as described in ¶¶ 2(b), (d), and (e), I seek permission to search any cellular telephone seized while searching either the TARGET SUBJECTS, SUBJECT LOCATIONS and/or SUBJECT VEHCILES for recent calls, contacts, address books, text messages, voicemail messages, email, photographs and other forms of communication.  I know in my experience that this information is often only temporarily stored in cellular telephones, and that there exist technologies whereby a remote user can delete information sought by law enforcement from a cellular telephone.  These communication devices will be searched according to the protocol on Attachment B

## VII.    NIGHTTIME EXECUTION

127.    Because these warrants are being executed for offense related to Title 21 of the United States Code, involving narcotics trafficking, and because this investigation is on-going, I request permission, pursuant to 21 U.S.C. § 879, to execute the warrants at anytime to protect the integrity of the investigation, prevent the destruction of evidence and to ensure the safety of the agents executing the warrants.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue arrest warrants for the TARGET SUBJECTS as well as search warrants for the TARGET SUBJECTS, SUBJECT LOCATIONS and SUBJECT VEHICLES for the items listed on Attachment A, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. § 846, which prohibits the conspiracy to distribute and possess with intent to distribute controlled substances, and Title 18 U.S.C. § 1956(h) conspiracy to launder money, .

13-1120SAG   to   13-1145SAG

Task Force Officer Brian Shutt
Drug Enforcement Administration

Sworn to before me this 10 day of May 2013 at 11:09 am hours.

Stephanie A. Gallagher
United States Magistrate Judge

**ATTACHMENT B**

This warrant authorizes the search of electronically stored information as described in Attachment A.

Because of the possibility that the electronically stored information in the subject electronic devices on Attachment A may include information that is beyond the scope of the information for which there is probable cause to search, the search shall be conducted in a manner designed to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed. While this protocol does not prescribe the specific search protocol to be used by the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA") it does contain limitations to what they may view during their search, and the agents shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment A hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that investigators conducting the search will view information that is beyond the scope for which probable cause exists. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

1.  Use of computer search methodology to conduct an examination of the electronically stored information contained in the subject electronic devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

2.  Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

3.  Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein.